**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE XETHANOL CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO. 06-10234(HB)

AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

<u>JURY TRIAL DEMANDED</u>

<u>INTRODUCTION</u>

This is a federal class action on behalf of purchasers of the common stock of Xethanol Corporation ("Xethanol" or the "Company") between January 31, 2006 and August 8, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants published a series of materially false and misleading statements that defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

3.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Xethanol maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Lead Plaintiffs Ronald Counsell, Clayton Antonio Leamons, John Zipay, Jr., and Ernest Shepherd (collectively, "The Counsell Group"), were appointed Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act in an Order of the Court dated March 14, 2007. As set forth in their certifications submitted with their Lead Plaintiff motion and incorporated by reference herein, Lead Plaintiffs purchased the common stock of Xethanol at artificially-inflated prices during the Class Period and have been damaged thereby.

6.      Defendant **XETHANOL CORPORATION** is a Delaware corporation with its principal place of business located at 1185 Avenue of the Americas, New York, NY 10036. According to the Company's profile, Xethanol, which was founded in 2000, engages in the

production and marketing of ethanol and its co-products in the United States. Ethanol, a clean burning, renewable fuel, is used as a primary gasoline additive. At all times, Xethanol distinguished itself from other ethanol producers by its purported ability to develop and optimize "biomass" as the substantial raw material for ethanol production, in addition to using corn, the more traditional raw material used in ethanol production. Biomass is generally post-industrial food or paper production waste, which has no cost (or even negative cost), it is available locally in markets where demand for ethanol is already high and it does not require the use of additional valuable resources or energy for its production.

7.      Defendant **CHRISTOPHER D'ARNAUD-TAYLOR** ("Taylor") was, during the Class Period, Chairman, Chief Executive Officer and President of the Company. Defendant Taylor remained in these positions until his abrupt and unscheduled termination in late August 2006. During the Class Period, defendant Taylor made and/or was responsible for numerous materially false and misleading statements and/or omissions about the Company, including the Company's SEC filings, including but not limited to Xethanol's Form 10-QSB and Form 10-KSB, which he signed and certified. ***During the Class Period, defendant Taylor sold over $1.36 million of his personally-held Xethanol shares while in possession of the true, adverse concealed material facts about the Company*** - - including the fact that ***defendant Taylor had fabricated significant work experience, misrepresented his leadership skills and management abilities and fabricated his resume***; and the fact that the Company's representations throughout the Class Period about its ability to produce and commercialize ethanol using "biomass" were false and misleading.

8.      Defendant **JEFFERY S. LANGBERG** ("Langberg") was, during the Class Period, a director at the Company. During the Class Period, defendant Langberg made and/or

was responsible for numerous materially false and misleading statements and/or omissions about the Company, including the Company's SEC filings, including but not limited to Xethanol's Form 10-K, which he signed.  During the Class Period, **defendant Langberg also sold over $1.41 million of his personally-held Xethanol shares while in possession of the true, adverse concealed material facts about the Company**.  According to Former Employee #2, defined below, in May 2006 at the New York offices of Xethanol, **Langberg stated in front of various Xethanol employees that he could "drive the price of the stock any way he wanted to."**

9.     Defendant **LAWRENCE S. BELLONE** ("Bellone") was, during the Class Period, Chief Financial Officer since April 5, 2005.  During the Class Period, defendant Bellone made and/or was responsible for numerous materially false and misleading statements and/or omissions about the Company, including the Company's SEC filings, including but not limited to Xethanol's Form 10-QSB and Form 10-KSB, which he signed.  Defendant Bellone is married to Sarah E. Smith ("Sarah Smith").  During the Class Period, Sarah Smith was the Principal Accounting Officer and a managing director of Goldman Sachs, Inc. ("Goldman Sachs").  According a former employee/vice president of a division of Xethanol during the Class Period ("Former Employee #1), **defendant Bellone's wife Sarah Smith was the sole driving force behind Goldman Sachs' decision to make a market in Xethanol stock.  Sarah Smith's connection to Xethanol and the importance of that connection to the decision by Sarah Smith to ensure that Goldman Sachs would make a market in and invest millions of dollars in Xethanol common stock was concealed from the market throughout the Class Period.**  According to Former Employee #1, other market makers followed Goldman Sachs' lead and thereafter invested in Xethanol.

10.     The defendants referenced above in ¶¶7-9 are referred to herein as the "Individual Defendants."

## RELATED THIRD PARTIES

11.     **GOLDMAN SACHS GROUP, INC.** and **GOLDMANS SACHS & CO.** (collectively, "Goldman Sachs") is a global leading global investment banking, securities, and investment management firm with its headquarters in New York City at 85 Broad Street. Goldman Sachs is incorporated in the State of Delaware.  Goldman Sachs was the first firm to make a market in Xethanol securities, investing $4 million as part of a $45 million private equity offering funded largely by Goldman Sachs' clients.  Following the announcement of the $45 million private equity offering and Goldman Sachs' involvement, shares rallied from $8.90 on April 5, 2006 to $13.67 on April 11.  As a market maker, Goldman Sachs acted as a middleman between selling broker and buying broker, who represent the seller and buyer respectively in a stock transaction in Xethanol securities.

12.     **SARAH E. SMITH** ("Sarah Smith") was, during the Class Period, the Principal Accounting Officer of the Goldman Sachs Group, Inc.  Sarah Smith is the spouse of defendant Bellone.  Because of her position and high level of authority at Goldman Sachs Group, Inc., Sarah Smith was able to, and did, ensure that Goldman Sachs would make a market in Xethanol securities during the Class Period.

## SUBSTANTIVE ALLEGATIONS

## OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME

5

13.     Throughout the Class Period, Xethanol portrayed itself as an early-stage biomass ethanol production company that utilized a business model predicated upon the commercialization of biomass-produced ethanol.  The Company purported to distinguished itself from other ethanol producers by its ability to develop and optimize "biomass" as the substantial raw material for ethanol production; as well as corn, the more traditional raw material used in ethanol production.    In this regard, defendants stated, *inter alia*.: "***The Company's business model is to deploy proprietary biotechnologies that will extract and ferment sugars trapped in these biomass waste concentrations in a cost effective manner…"; "Our expansion plan envisions state-of-the-art engineering design and equipment and the integration of cutting edge processing technologies."; "The Company plans to optimize the use of biomass in the renewable energy field and convert biomass that is currently being abandoned or land filled into ethanol or other valuable co-products…"*** [Emphasis added].

14.     This distinction was critical to investors because biomass ethanol production has a distinct competitive advantage over corn ethanol production.  Biomass - - generally post-industrial food or paper production waste - - has no cost (or even negative cost), it is available locally in markets where demand for ethanol is already high, and it does not require the use of additional valuable resources or energy for its production.

15.     Throughout the Class Period, defendants repeatedly stated that Xethanol's plan called for the Company, first, to sustain itself on revenues produced from traditional corn ethanol production, and with the money raised from both public and private investors, defendants consistently stated that Xethanol was entering its second phase of development.  The second phase of development for Xethanol called for the Company to commercialize biomass ethanol production in the immediate near-term.

16.     Thus, to reach its near-term business objectives, throughout the Class Period, defendants purported to own and operate two ethanol plants in Iowa - - Xethanol BioFuels in Blairstown and Permeate Refining in Hopkinton.  The first of these plants was a corn-based plant that was in operation at all relevant times.  The second, the Permeate Refining plant, purported to have previously used candy production waste to create biomass ethanol.   According to defendants, however, by the inception of the Class Period, this second plant had been "temporarily" shut down as part of Xethanol's growth plan, so that it could be "refurbished," updated and returned to service as a multi-stream, or pure-biomass ethanol production facility. With respect to the Iowa plants, defendants stated, *inter alia*: "***In Iowa, Xethanol owns two ethanol production facilities, where it is deploying these technologies…***"; "***we are currently evaluating a plan to adapt Permeate to become a full production cellulosic biomass to ethanol facility***. Under this plan, we would use local industrial biomass waste streams as our feedstock…"; ***"It is expected that any required physical plant alteration [at Permeate] would be relatively minor and could be accomplished within 6 months;"*** "***it will be our first cellulosic biomass facility and a proving ground for our technologies…"*** [Emphasis added].

17.     In addition to the two Iowa plants, throughout the Class Period, defendants also reported that Xethanol had purchased additional plants to expand its ethanol production locally and regionally. In this regard, defendants stated, *inter alia*: "This year ***d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge*** left over from paper milling"; "***We intend to implement proprietary bio-separation and bio-fermentation technologies at these coastal facilities that will allow us to use local biomass waste streams,*** such as industrial food processing wastes, in ethanol production."

18.     The Company also announced it had formed various joint ventures during the Class Period.   These joint ventures were also   very important to investors because they represented the Company's first regional strategic alliances - - formed to develop and execute business opportunities outside the corn-belt of Iowa.   These joint ventures represented critical milestones in the Company's evolution, because they purported to evidence Xethanol's ability to produce ethanol locally, using post-consumer or post-industrial biomass waste streams.   With respect to the joint ventures, defendants stated, *inter alia*: "This alliance between Xethanol and Global Energy Management leading to the formation of ***NewEnglandXethanol is the second milestone in our East Coast regional roll-out plan***."; "CoastalXethanol will be a strategic alliance between Xethanol and Coastal Energy Development, Inc.  ***Its mission is to develop ethanol production throughout Georgia and the Southeast region***…***CoastalXethanol plans to open several ethanol plants throughout the region, deploying Xethanol's proprietary technologies…";*** "The H2Diegsel technology, and our commitment to its deployment, ***reinforces our mission to be in the forefront of innovation in the biofuels sector***." [Emphasis added].

19.     The statements concerning the Company's plants, as well as the announcement of its joint ventures, served to bolster investors' belief that Xethanol was operating according to plan and was ***already reaching its second stage of development - - the commercialization of biomass ethanol production.***

20.     In addition to the foregoing, throughout the Class Period, defendants also stated that Xethanol maintained a complex system of internal controls and procedures that reasonably assured the veracity and completeness of the Company's statements and disclosures.

8

21.     On or about April 5, 2006, Xethanol announced that it had signed definitive agreements for up to $46 million in two separate equity financing transactions.  Under the terms of the second transaction, Xethanol announced it "will initially receive $4 million from the issuance of shares of its common stock to Goldman Sachs & Co.  Additionally, over the next three years, Xethanol could receive up to an additional $1.4 million from the exercise of warrants issued to Goldman Sachs."  The market reacted very positively to the news that Goldman Sachs was making a market in Xethanol securities and the stock rallied upwards, shares rallied from $8.90 on April 5, 2006 to $13.67 on April 11.

22.     The combination of defendants' positive statements about the Company, Goldman Sachs' market making in its securities, as well as Xethanol's representations concerning its management and its internal controls caused Xethanol shares to trade above $15.00 by late-April 2006.  Moreover, during the Class Period, there was a large spike in Xethanol trading volume, as Company shares suddenly and regularly traded several hundred thousand units, and even several million units, per day.

23.     Unbeknownst to investors, however, throughout the Class Period, Xethanol shares had been artificially inflated and the statements made by defendants, as well as the representations concerning the Company's systems and controls, were either patently untrue, or defendants recklessly disregarded the true, adverse facts concerning the Company's business plan, technological capabilities, strength, profitability and prospects, which were in stark contrast to the statements made during the Class Period.

24.     Throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors that were negatively impacting Xethanol's business, described in detail below.

## CONCEALED, ADVERSE FACTS CONCERNING THE COMPANY

### The Company Never Had the Technology It Touted

25.     Xethanol had not produced significant amounts of ethanol from biomass and was not entering or nearing a commercialization phase.   In truth, Xethanol utterly lacked the technological capability to create the enzyme needed to make ethanol from biomass in a commercially viable manner.  ***The Company did not have this technology at any time during the Class Period and still does not have the necessary technology today.***

26.     Therefore, the Company was not operating according to plan.  To the contrary, Xethanol ***could not achieve the near-term commercialization of biomass ethanol production***, ***or achieve the guidance sponsored and/or endorsed by defendants.***

27.     A former employee of Global Energy and Management during the Class Period, ("Third-Party Witness #1") stated that Xethanol "***didn't have the product***, ***or as we say the 'silver bullet.'"*** Third-Party Witness #1 explained that Xethanol ***did not have a process that could convert biomass into ethanol on a commercial scale.***  Third Party Witness #1 stated that to this day, "***Nobody has it***."

28.     Former Employee #1, a former Xethanol vice president of business development, stated that at the time he joined Xethanol, prior to the Class Period, the Company ***"did not have a process for cheaply making ethanol from celluloid at a commercial level."***  Former Employee #1 indicated that the race has been to find enzymes to enable this process to be performed cost effectively but that "***no one can do it cost effectively today***."

29.     Another former employee who worked for the Company during and after the Class Period as Vice President of Operations and reported directly to defendant Taylor ("Former

Employee #2) stated that during his tenure at the Company, **the enzymes necessary to convert wood chips or other "biomass" into ethanol "were not ready yet**."  Xethanol did not have the problem solved.  Former Employee #2 indicated that the enzymes in question were not being made or worked on by the Company.  Rather, Xethanol had discussions with a number of companies and tried to set up partnerships with them, including companies such as Novazyme and Genentech.  Former Employee #2 indicated that Xethanol was "**not investing in the development of any enzymes**."  Former Employee #2 indicated that the "**enzymes are still not working**," even today.

30.     Former Employee #3, a former human resources manager at Xethanol who was with the Company for a three month period immediately after the end of the Class Period, further confirms that Xethanol **never had the necessary technology for commercial production of ethanol using biomass.**  Former Employee #3 indicated that he reported to the Vice President of Operations, Lucas Rice.  Upon joining Xethanol, Former Employee #3 expected to be setting up health benefits, payroll, and human resources policies.  Instead, he was repeatedly informed by management that the Company was "not ready" to make these changes and he was eventually terminated because the Company was not ready to ramp up.  Former Employee #3 indicated that, **as of September 2006, none of Xethanol's plants was producing ethanol from biomass**.  Former Employee #3 stated that "**xethanol is still trying to make ethanol from citrus peel**."  Former Employee #3 had been told that **they were using only corn because they were "not really ready" to use biomass.**

### Board Members: "Not Straight with One Another"

31.     After his departure from the Company in November 2006, Former Employee #3 had a conversation with former Board member and former interim-CEO Louis Bernstein

("Bernstein"), whom Former Employee #3 called to discuss Bernstein's statements to the newspaper discussed herein below.   During the conversation, Bernstein stated that he "disagreed" with the people who had been elected.  He told the board that if they elected David Ames that he would leave on principle.  Bernstein also informed Former Employee #3 that ***the Board members were not straight with one another and were not sharing vital information about the Company with him.***  For example, Bernstein found out that an individual out of Coastal Energy in Savannah, whom Xethanol had entrusted with millions of dollars had a history of multiple bankruptcies.  When Bernstein confronted the Board, he learned that its members had known about this concern all along.  Bernstein also learned that the same individual had prior relationships with Ames that were not disclosed to him.

### Management: Fraudulent Resume, Unethical Conduct, and Questionable Connections

32.     Contrary to the Company's representations during the Class Period, Xethanol was not run by management with credibility and a high standard of ethics, and defendant Taylor did not have significant management experience at major domestic corporations. In truth, defendant Taylor had fabricated his resume, including material, relevant corporate management experience at various companies that he never worked at in any capacity!  These companies include: Unilever, Reed Elsevier and Northrop Grumman.

33.     Defendant Taylor also had a troubling history of business ventures with questionable persons, including  partnering with James Hackney ("Hackney") to form London Manhattan Ltd.  Hackney was indicted for mail fraud for crimes allegedly committed while he was Taylor's partner at London Manhattan Ltd.  Taylor was also named a defendant in a lawsuit by a doctor alleging that a fraud had been committed by various persons including Taylor, who had allegedly posed as a financier interested in backing the doctor.  While the doctor's case was

settled, each of Taylor's co-defendants in the case were, in various criminal actions, indicted or convicted of fraud, money laundering, and related charges.

34.    With respect to management's ethics, Former Employee #1 indicated that **he had been placed in "a bad ethical situation"** by the Company and **"told [management] I would not lie**" about the extent of the progress that Xethanol had made towards making ethanol from any product other than corn.

35.    Many of the Company's initial investors had disturbing histories of stock fraud, market abuse, breach of fiduciary duty and breach of contract. These disturbing facts are set forth in a Table of "Xethanol Initial Investors' Prior Bad Acts" set forth below:

### XETHANOL INITIAL INVESTORS' PRIOR BAD ACTS

| NAME | AFFILIATION | SHARES OF XETHANOL | REGULATORY and LEGAL ACTIONS/ PENALTIES IMPOSED |
|------|-------------|--------------------|------------------------------------------------|
| William Scott Smith | Former stockbroker—now barred by the SEC from serving as an officer or director of any public company | 972,414 shares. 338,115 additional shares held by housemate Therese Roos. | -Charged by the SEC in 2005 with defrauding investors in a Denver-based shell company—Melbourne Capital Corp.<br>-Assessed $256,000 in financial penalties and barred from serving as an officer or director of any public company.<br>-Sued along with defendant Taylor in 1996 by physician who alleged he had been defrauded. |
| Walter Nathan | Treasurer and CFO of Zen Pottery Equipment, Inc. | 383,333 shares | -Charged by the NASD in 1987 after two clients alleged they were guaranteed against loss as an inducement to invest $100,000 in penny stock.<br>-NASD fined Nathan $5,000 and suspended from association with any member firm for 60 days. |
| Lawrence Underwood | Zen Pottery Equipment, Inc. shareholder; Denver stockbroker | 138,974 shares | -Charged by the NASD in 1986 with violating the rules of fair practice by charging excessive markups.<br>-Censured, fined and ordered to disgorge $10,000. |
| Stanley C. Brooks | Chairman of Brookstreet Securities Corp., co-owned by Brooks and spouse | 100,000 shares held by Brookstreet Sec. Corp. | -In January of 2006, Brooks settled compliance-related charges the NASD brought against him and affiliated brokerage (First Securities USA, Inc.).<br>-Brooks has been banned for two years from serving in any supervisory capacity with any member firm. |
| Russell W. Newton | CFO of Source Capital Group, Inc. | 94,639 shares, exclusive of options | -Investigated by NASD and State of Connecticut.<br>-In 1999, NASD imposed a $180,000 fine against Newton and previous firm (Merit Capital Assoc., Inc.) for using brokers known to have been barred from the industry. |

| | | | -Suspended for 30 days and ordered to retake a qualifying exam.<br>-In 2001, Utah Division of Securities brought charges against Newton and Merit Capital, alleging sale of unregistered securities, sales by unlicensed agents, failure to supervise and securities fraud.  Settled the charges and was assessed a joint fine of $25,000. |
|---|---|---|---|
| Marc K. Swickle & Howard B. Berger | Co-founders of Professional Traders Fund, LLC | 46,153 shares held by Professional Traders Fund | -Washington Division of Securities filed a complaint in February 2006 against Swickle, Berger, and Professional Traders, alleging they sold unregistered securities to residents of WA.<br>-Berger settled NASD charges in 2000 related to "flipping" of shares in the IPO of a penny-stock company.<br>-Berger agreed to pay $20,000 fine and was suspended from working in a supervisory capacity for any NASD member firm for 2 years. |

36.     Defendants had omitted to disclose a host of related party transactions, as well as the above-referenced associations with several early stage investors that had alarming records of stock fraud, market manipulation, breach of fiduciary duty and shareholder abuse, discussed above.

37.     Defendants utilized an unusual and suspicious reverse merger into a shell corporation to avoid disclosing many of these relationships and the complex web of troubling related parties, including the fact that Zen's management included a former stockbroker, Walter Nathan ("Nathan"), who was investigated, fined and suspended by the NASD, and Lawrence Underwood ("Underwood"), one of Zen's major backers was censured by the NASD (charges dropped after appeal).  Both were among the initial backers of Xethanol.  *See* Chart above for further information regarding Nathan and Underwood and other initial Xethanol backers.

38.     Former Employee #2 stated that Xethanol management was "***not completely up front*** *when they announced David Ames as the new CEO because they did not disclose certain "prior relationships."*

**Misrepresentations Concerning Iowa Plants**

14

39.     Defendants had misrepresented the true state of the Company's Hopkinton, Iowa plant, and its Blairstown, Iowa plant.  In fact, at all relevant times, the Hopkinton plant was *not* being refurbished but, rather, it lay abandoned and neglected with no current water or sewer service and no employees working at the site.  There were no improvements whatsoever and the plant was not being used as a test facility for new technologies to convert biomass to ethanol in a commercially viable manner, nor could it be, as no such technologies had been obtained by or developed by the Company.  After the Class Period, **Robin Buller, Xethanol's vice president of strategic development admitted that the Company's business presentation stating that Xethanol had two plants in Iowa "was a mistake" and that the description in the presentation was "incorrect."**

### The Goldman Sachs' Hidden, Undisclosed Connection

40.     According to "Former Employee #1, **defendant Bellone's wife, Sarah Smith, was the sole driving force behind Goldman Sachs' decision to make a market in Xethanol stock.  Sarah Smith's secret connection to Xethanol and the importance of that connection to the decision by Sarah Smith to ensure that Goldman Sachs would make a market in and invest approximately four million of dollars in Xethanol common stock and to encourage its investors to invest tens of millions of dollars in Xethanol stock was hidden from Class members and the market.**  According to Former Employee #1, other market makers followed Goldman Sachs' lead and thereafter invested in Xethanol.

### The Augusta, Georgia Plant

41.     Former Employee #1 indicated that Xethanol had two or three processes in their infancy, but the Company **never put the necessary research and development resources** into

these "islands" to develop them.   Prior to the Company's decision to build a large plant in Augusta, Former Employee #1 informed management – including defendant Taylor– that **the Company needed more time to get more work done to develop processes before they would be ready to build anything**.   Taylor and Murphy told Former Employee #1 "No," and indicated that the Augusta plant would be built at that time, even though the technology was not ready.

42.     Former Employee #1 was not permitted to go to the Company's Augusta, Georgia plant to make an assessment of the technology, even though he was the Company's expert on ethanol.

### Spring Hope, North Carolina Plant: Creating a False "Illusion"

43.     Former Employee #1 visited the Spring Hope, North Carolina, operation prior to the Company's purchase of the facility.   Former Employee #1 advised management not to buy the facility at the offering price because there was "no benefit" to the Company.   Former Employee #1 also stated to management the belief held by Former Employee #1 that the owner of the facility was a "crook."

44.     When Former Employee #1 and other Xethanol employees flew down to inspect the Augusta plant and meet with its owner, the meeting lasted only 15 minutes.   The owner of the plant described his "plan" by which Xethanol would allegedly become the first company to produce ethanol from biomass.   Specifically, the owner stated that they would fill the digesters at the Spring Hope plant with waste and use acid hydrolysis.   Then they would ferment the mass and produce slurry containing alcohol.   The slurry would then be shipped to a distillery to be made into ethanol.   **Former Employee #1 said that this plan was intended to deliver the "illusion" that Xethanol was the first company that could commercially produce ethanol, but the reality was that the process proposed was not cost effective and was no different**

16

***from what other ethanol producers could produce today.***   Former Employee **#1** also explained that ethanol could be made using acid hydrolysis, but that it was so prohibitively expensive as to not be a commercially viable option.

45.     Nevertheless, despite Former Employee #1's advice to the Company not to do the deal, defendants went through with the deal to purchase the Spring Hope Plant.  According to Former Employee #3 (described below), the Spring Hope plant was a defunct fiberboard plant that was "***mostly just a big pile of industrial crap.***"

## Inadequate Controls/ GAAP Non-Compliance

46.     Xethanol did not have adequate systems of internal operational or financial controls, and Xethanol's operational and financial reports were not true, accurate or reliable. Defendants materially overstated the Company's profitability by underreporting Xethanol's true cost of completing a biomass-to-ethanol production facility and by failing to make proper, timely adjustments to the Company's stated financial reports and balance sheet.

47.     The Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules. In addition, because of the lack of true independence between the Company and many of its business partners and joint venture partners, and because of other material omissions and misrepresentations, the risk of investing in Xethanol was materially higher than defendants disclosed, and than investors could discern through a reasonable due diligence investigation.  If fact, the fraud in this case is so particularly egregious and shocking that if the true facts were known prior to the beginning of the Class Period, no reasonable investor would have invested in Xethanol stock.

## THE TRUE FACTS EMERGE

48.     It was only at the end of the Class Period, however, that investors ultimately learned the truth about the Company after a forensic securities investigations Internet website called *ShareSleuth.com* published a widely circulated report that was highly critical of Xethanol and its management.   Among other things, this report stated that **there was little evidence Xethanol had produced significant amounts of ethanol from biomass to claim that it could achieve commercialization**, and that substantial related party associations had not been disclosed - -  including the fact **that many of the Company's early investors had been disciplined by regulatory agencies**, and that **defendant Taylor had fabricated his work experience** and qualifications on his resume.

49.     After the Class Period, a shake-up of the board of directors further confirmed the true adverse fact, concealed throughout the Class Period, that Xethanol never had the technology it touted.   Two members of the board – Marc Oppenheimer ("Oppenheimer") and then-interim CEO Bernstein – resigned from the Board.   Oppenheimer indicated in a letter that he had disagreed with the Board's adoption of a plan of action [*e.g.*, expansion of the biomass to ethanol program] that he deemed "unachievable."   Oppenheimer later stated publicly: **"There's one tried and true way to make ethanol.  You make it out of corn.  Promising to make it out of waste?  Well, you shouldn't promise what you can't deliver."**

50.     As investors now know, defendants were motivated to, and did, conceal the true operational and financial condition of Xethanol, and materially misrepresented and failed to disclose the conditions that were adversely affecting Xethanol throughout the Class Period, because: (i) it enabled defendants to artificially inflate the price of Company shares; (ii) it

enabled defendants to register for sale with the SEC, millions of shares of Company stock held

by insiders and/or defendants and also allow defendants to raise over $45 million through the

private sale of equity, each while in possession of material adverse non-public information about

Xethanol; (iii) it enabled certain insiders, including defendants Taylor and Langberg to liquidate

millions of dollars of their personally held Xethanol shares, also while in possession of material

adverse non-public information about the Company; and (iv) it caused investors to purchase or

acquire shares of Xethanol stock at artificially inflated prices.

<u>**Background to the Class Period**</u>

51.     Xethanol was not formed traditionally by following all SEC filing requirements

but, rather, the Company was formed on or about February 2, 2005, through a so-called "reverse

merger" transaction with a registered "shell" corporation.   In effect, Xethanol and a registered

corporation named Zen Pottery Equipment, Inc., based in Colorado, merged through an entity

called Zen Acquisition Corp., a Delaware corporation.   Ultimately, Zen Acquisition Corp. was

merged with and into Xethanol Corp.

52.     As a result of this reverse merger, the Company issued 9.706 million shares of

common stock to the former stockholders of Xethanol representing 74.0% of the Company's

outstanding common stock.   In connection with that merger, the Company also completed the

closing of a private offering of a total of 1.19 million shares of common stock at a purchase price

of $3.25 per share to accredited investors.   Gross proceeds from the initial closing of the private

offering were slightly over $3.0 million.   The Company also received an additional $867,849

upon a second closing of the private offering on February 15, 2005, for total private offering

proceeds of $3.867 million.

53.     After the closing of the merger and the closing of the private offering, the Company reported that it had a total of 13.437 million shares of common stock and warrants to purchase 1.293 million shares of common stock.

54.     Both prior to and during the Class  Period, Xethanol falsely portrayed itself to investors as an early-stage biomass ethanol production company that utilized a business model predicated upon the traditional production of ethanol from corn while commercializing biomass to ethanol production.   As the Company purported to sustain itself on revenues produced from traditional corn ethanol production with money raised from both public and private investors, defendants consistently stated that Xethanol was entering its second phase of development and would be able to commercialize biomass ethanol production in the immediate near-term.

55.     Moreover, the Company repeatedly promoted the benefits of its biomass ethanol production technologies as being far superior to traditional corn ethanol production and conditioned investors to believe that Xethanol already possessed the skills and abilities to commercialize biomass ethanol production in the very-near term.   At all times, Xethanol consistently stated that its ethanol growth strategy encompassed a three-pronged approach, ultimately geared to the production of local biomass produced ethanol.   This approach is summarized in the Company's SEC filings, as follows:

·       Increase production capacity at our Iowa facilities through the physical expansion of these facilities utilizing cutting-edge engineering design as well as integration of our processing technologies,

·       Employ a regional approach to building new ethanol production by focusing on port sites and coastal urban areas on the Atlantic and Gulf coasts. By creating a regional alliance strategy we will combine Xethanol's ethanol expertise with local capital, human resources and project development skills to penetrate coastal markets presently being served by "imports" from the Corn Belt, and

· Employ a sector strategy to expansion by focusing on the forests products industry, a prolific provider of biomass waste streams and an area where we believe we have significant technological advantages.

56.     Throughout the Class Period, the Company purported to own and operate two ethanol plants in Iowa – Xethanol BioFuels in Blairstown and Permeate Refining in Hopkinton – in addition to other later-acquired plants.  Regarding the two Iowa plants, the Company's SEC filings also stated, in part, that:

> *We also own several proprietary bio-extraction, bio-separation and bio-fermentation technologies that are targeted at reducing costs throughout the entire ethanol production process as well as enabling the conversion of biomass to ethanol and xylitol.*

> **Xethanol BioFuels** was acquired in November 2004 as an idled plant. During the first six months of 2005, this facility underwent substantial refurbishment and became operational in July 2005. This is *a corn-based operation* with an initial production capacity of 5.5 millions gallons of ethanol per year. After initial discussions with The Harris Group, our "owner's engineering" firm, we are now evaluating contractor proposals to increase the plant production capacity to 25 million gallons and at the same time optimize efficiency. The BioFuels facility is located on a 25 acre site with ample space for expansion.

> **Permeate** was initially designed to process waste starches and sugars and has a production capacity of 1.6 million gallons of ethanol per year. ***In April 2005, we*** <u>***temporarily***</u> ***ceased operations at the Permeate Refining plant in order to*** <u>***refurbish***</u> ***the facility and evaluate strategic alternatives. We are currently evaluating a project to convert Permeate into one of the first US commercial cellulosic biomass to ethanol facilities.***

57.     At or about the inception of the Class Period, defendants also reported that Xethanol had formed joint ventures to expand ethanol production locally.   The announcement of these joint ventures was critical to investors because they represented the Company's first regional strategic alliances, formed to develop and execute business opportunities in both the Southeast and New England regions.  These joint ventures also represented critical milestones in the Company's evolution, because Xethanol's stated plan was to produce ethanol from biomass using local waste streams.   Thus, the announcements of these joint ventures served to support

investors' belief that the Company was operating according to plan, and was already reaching its second stage of development - - the commercialization of biomass to ethanol production.

58.     The Company's website clearly states the competitive advantages of producing ethanol from biomass, which is virtually free for the taking and available everywhere.  In fact, a review of the Company's website clearly distinguishes Xethanol as a biomass ethanol producer and boldly pronounces the advantage of its business.  In this regard the Company's website states, in part, the following:

> Take the solution to the waste not the waste to the solution

> Xethanol Corporation is committed to the production of ethanol and related products in manufacturing facilities close to the major urban markets for those products, using locally available raw materials. ***Xethanol's Business Approach calls for the use of locally available biomass rather than corn as the primary raw material for ethanol production.***

> Xethanol breaks ground on its 35 million gallon a year ethanol facility at Blairstown, IA which is beside its existing plant currently producing 6.5 million gallons a year

> [Emphasis added].

59.     Xethanol's website also states that its business approach, using locally produced biomass is substantially "better than corn."  In this regard, Xethanol's website states that:

> **Better than corn**

> Corn is currently the dominant raw material for ethanol production.  As a result this production is now concentrated in the Corn Belt - thousands of miles from the areas of highest ethanol demand on the Atlantic, Gulf and Pacific coasts.

> **Use of local waste**

> ***Xethanol's Business Approach calls for the use of locally available biomass rather than corn as the primary raw material for ethanol production.*** Biomass is organic waste material and includes everything from wood chips and yard waste, to corn stover and municipal solid waste.

> **Cheaper feedstock**

22

Biomass of various kinds is abundant in the high-demand coastal areas. Its generation is widely dispersed, and its value is too low to make transportation viable to a large footprint central processing facility. Because most biomass streams are now either abandoned or land-filled at the producer's expense, biomass is potentially a significantly cheaper feedstock for ethanol production than corn.

\*\*\*

**Lower freight expense, higher margins**

Xethanol plans to locate biorefineries for ethanol fuel production close to high-density urbanized ethanol markets and to reliable biomass sources - so reducing freight and raw material costs, capturing higher ethanol prices and gaining the benefit of improved margins.

60.    The statements on the Company's website, reproduced above, existed both prior to and throughout the Class Period. In addition to the statements concerning Xethanol's intention and ability to convert biomass to ethanol, the other statements made by defendants immediately prior to the inception of the Class Period also remained uncorrected at all times during the Class Period.

**Defendants' Materially False and Misleading
Statements Made During the Class Period**

61.    On January 31, 2006, the inception of the Class Period, *Fortune Small Business Magazine* featured Xethanol and highlighted the "innovative" way in which the Company converted "candy" and other biomass into Xethanol. This report relied on representations and omissions by defendants and stated, in part, the following:

> ***Entrepreneurs tend to stay at least one step ahead of the pack, and lately they have been widening their lead.*** Small businesses are generating so much that's new in our economy that more and more big corporations are buying them up to gain access to their research and development. With that in mind, ***we found a half-dozen entrepreneurs who have a new idea, business, or invention you're bound to be hearing about over the next year or so.***
>
> FILL 'ER UP WITH CARAMEL

23

Leftover Halloween candy might not seem like fuel for anything but dental cavities, but Xethanol, a firm based in New York City, may change that perception.

***Since 2003, Xethanol has operated two Iowa plants that can cheaply distill a gasoline additive called ethanol from bizarre sources such as stale butterscotch candy***. When technicians mix the sweets with a special form of yeast, fermentation results, producing ethanol. (Typically producers of ethanol derive the clean-burning, high-octane fuel from corn.) Big oil companies then combine it with unleaded gasoline to reduce the cost of gas and the air pollution it causes.

***Xethanol isn't just relying on candy for its fuel supply. This year it plans to introduce a process that will make it possible to turn all kinds of things*-**-including cornstalks, grass clippings, and old newspapers--*into ethanol*. If all goes as planned, 59-year-old CEO and founder *Christopher d'Arnaud-Taylor projects revenues of $15 million this year, up from $2.5 million in 2005--and the first-ever profit for Xethanol,* which he started in 2000 and took public last February. "Where there's muck, there's money," he quips.

***Xethanol will use a recently discovered form of yeast to ferment various types of garbage into ethanol***. It has obtained rights to the process from the U.S. Department of Agriculture, where a scientist discovered that a yeast in the intestines of a type of beetle can convert plant-based waste product into ethanol.

***This year d'Arnaud-Taylor intends to begin opening plants on the East Coast that will use yeast from the beetles to brew ethanol from sludge left over from paper milling. The plants will be able to make in total more than 100 million gallons of ethanol a year.*** That's a trickle, considering that Americans burn nearly 21 million barrels of oil every day. But it's a start. Thanks to federal subsidies and $60-a-barrel oil, it's a seller's market for ethanol. ***And even if oil prices drop below $30 a barrel, Xethanol needn't worry, say experts. "Relying on cheaper processes than competitors could help the company if prices fall***," says Anthony Marchese, president of Monarch Capital Group in New York City… [Emphasis added.]

62.    In addition to the foregoing, in *a Business Wire* report, dated the same day, the

*Fortune* report was highlighted, and defendant Taylor added the following comments:

Xethanol Chairman and CEO Christopher d'Arnaud-Taylor commented ***"It is most gratifying for our stockholders and employees that Xethanol has been recognized as an innovator by FORTUNE and for our Blairstown plant to be given such prominence on the cover***." Mr. d'Arnaud-Taylor added "There are strong legislative and commercial tailwinds driving the future of ethanol and our company. The government's support for ethanol is likely to receive a further boost

24

in President Bush's upcoming State of the Union address. Furthermore, the commitment of Ford Motor Company and General Motors to increasing production of ethanol enabled Flexible Fuel Vehicles, indicates that **Xethanol is aligned with meeting our Nation's need for energy independence and the production of a safe, clean-burning fuel**. [Emphasis added.]

63.     Following the publication of the *Fortune* report and the *Business Wire* release announcing the article and quoting defendant Taylor, the price of Xethanol shares immediately rallied and trading volume spiked.  In fact, shares of the Company traded from approximately $3.20 per share, on volume of 36,000 shares, on January 26, 2006, two trading days before the *Fortune* report was filed, to a high of almost $6.00, before closing at $5.75, as over 1.8 million shares traded on January 31, 2006, as the *Fortune* report and press release announcing this report were circulated.  This trading volume appears to have been greater than the total trading volume of all of the Company's shares from the time Xethanol stock began trading in March 2005, until that time.

64.     On February 27, 2006, defendants published a release on *PR Newswire* announcing that Xethanol had selected a stock promotion company named Zangani to further expose the Company to the investor community via webcasts and podcasting; as well as an "Investor Portal" designed to "communicate Xethanol's vision" to a broader audience.  This release also stated, in part, the following:

> Xethanol Corporation, a biotechnology driven ethanol production company, announced today that is has retained Zangani to help further develop future business plans, licensing deals, international exposure and investor community communications.

> Zangani will produce and webcast company presentations, CEO interviews and Q&A forums with their established investor community. "The point of this programming will allow us to help Xethanol take advantage of new media opportunities which enhance their other communication vehicles," said Leonardo Zangani, founder and President of Zangani.

> "All presentations and interviews will be produced and uploaded to the Zangani

25

Investor Community on the same day to allow for immediate dynamic interaction between Xethanol and our community with Zangani being the conduit for that information," stated Kevin Nally, business development consultant and moderator for the Zangani Investor Community.

**Mr. Christopher d'Arnaud-Taylor, Chairman and CEO of Xethanol, commented: "We are very excited by the opportunity to team with Zangani to leverage their new media skills and spread the Xethanol message to a wider investor audience, especially the European business development opportunities that Zangani can open up to us".**

Podcasting is a method of publishing and distributing audio files via the Internet. Podcasts can be listened to directly from a computer or downloaded to a portable media player, such as Apple's iPod. [Emphasis added.]

65.     The same day, February 27, 2006, *Stockguru.com* also published a release on M2 Presswire reporting the following:

**Xethanol Corporation's goal is to be the leader in the emerging biomass-to-ethanol industry. Xethanol's mission is to optimize the use of biomass in the renewable energy field and convert biomass that is currently being abandoned or land filled into ethanol and other valuable co-products, especially xylitol. Xethanol's strategy is to deploy proprietary biotechnologies that will extract and ferment the sugars trapped in these biomass waste concentrations**. Xethanol's strategic value proposition is to produce ethanol and valuable co-products cost effectively with ethanol plants located closer to biomass sources. **In Iowa, Xethanol owns <u>two</u> ethanol production facilities, where it is deploying these technologies**. For more information about Xethanol, please visit its website at http://www.xethanol.com. [Emphasis added.]

66.     The news reiterating that the Company was currently exploiting biomass to ethanol production at its *two* plants, as well as the news that Xethanol had hired a stock promotions firm also had the effect of propelling its shares higher.  Accordingly, on February 27, 2006, shares of the Company rallied over $1.00 per share to close at $6.60 per share, on trading volume of just under 1 million shares.

67.     On March 31, 2006, defendants filed with the SEC the Company's year end 2005 annual report, pursuant to Form 10-KSB.  In addition to reiterating many of the same materially

false and misleading statements as had been published by defendants previously, at that time, the

2005 Form 10-KSB described Xethanol to investors, in part, as follows:

> ***Xethanol Corporation (the "Company") is a biotechnology-driven company in the emerging biomass-to-ethanol industry***. The Company produces ethanol and its co-products. Ethanol is a clean burning, renewable fuel and is used as a primary gasoline additive under the Energy Policy Act of 2005. ***The Company plans to optimize the use of biomass in the renewable energy field and convert biomass that is currently being abandoned or land filled into ethanol or other valuable co-products. The Company's business model is to deploy proprietary biotechnologies that will extract and ferment sugars trapped in these biomass waste concentrations in a cost effective manner by locating ethanol plants closer to biomass sources and in proximity to urbanized high-demand ethanol markets***.
>
> The Company was originally incorporated on January 24, 2000 in Delaware as Freereal-Timequote.com, Inc. On August 8, 2000, the Company changed its name from Freereal-Timequote.com, Inc. to LondonManhattan.com, Inc. ("London Manhattan"). On September 19, 2001, LondonManhattan changed its name to Xethanol Corporation, to function as a holding and management company for a series of planned acquisitions and new ventures in the biomass-to-ethanol industry. [Emphasis added.]

68.    The 2005 Form 10-K also described the history of the unusual formation of the

Company, described in the background section above.  The Company's 2005 Form 10-KSB did

not disclose whom its early-stage investors were, or describe the Company's current

relationships with them, including numerous persons who had had serious legal and regulatory

problems in connection with other securities ventures, including regulatory sanctions including

fines, prohibitions from practice as brokers, and the like.

69.    Consistent with defendants' prior representations, the 2005 Form 10-KSB again

reported that Xethanol then owned and operated two ethanol production facilities in Iowa.  One

of these two facilities was referred to as Permeate Refining, Inc. located at Hopkinton, Iowa.

With regard to operations at the Permeate Refining plant, the Form 10-K stated the following:

> In April 2005, the Company ***temporarily*** ceased operations at Permeate in order to ***refurbish*** the facility and to consider alternatives to maximize the strategic use

of the facility. The Company is currently evaluating the possibility of utilizing the facility initially as *a pilot plant for commercializing certain of its technologies* and ultimately scaling up the facility once the technology proves out.

\* \* \*

*With regard to our Permeate facility, we are currently evaluating a plan to adapt Permeate to become a full production cellulosic biomass to ethanol facility. Under this plan, we would use local industrial biomass waste streams as our feedstock*. We would convert these waste streams utilizing certain of our front end processing technologies. The Permeate facility is ideally designed for this project. It is anticipated that the facility could quickly ramp up from 1.6 million gallons per year to 4 millions gallons per year. A few of the very attractive aspects of this project are 1) *it is expected that any required physical plant alteration would be relatively minor and could be accomplished within 6 months, 2) it will be our first cellulosic biomass facility and a proving ground for our technologies, and 3) it will increase of overall production levels and profitability.*

\* \* \*

Permeate Refining was initially designed to process waste starches and sugars and has a production capacity of 1.6 million gallons of ethanol per year. In April 2005, we temporarily ceased operations at the Permeate Refining plant in order to refurbish the facility and evaluate strategic alternatives. *We are currently evaluating a project to convert Permeate into one of the first US commercial cellulosic biomass to ethanol facilities*. We are pursuing a plan combining steam gun explosion technology with our proprietary Virginia Tech fermentation technology. *Under this plan, Permeate production capacity could be increased significantly with enhanced operating efficiency.* [Emphasis added.]

70.     The statements concerning the Company's intentions to refurbish the Hopkinton plant were also critical to investors because, during the fourth quarter of the prior year, *defendants had charged over $3.635 million to expenses representing the unamortized cost of acquiring license agreements, after considering the uncertainties surrounding the timing of their commercialization*.   The technologies relating to that write-down primarily related to technology then recently acquired for stock, through UTEK, and included the following:

**Advanced Bioethanol Technologies, Inc.**

*On June 29, 2004, the Company acquired 100% of the issued and outstanding common stock of Advanced Bioethanol Technologies, Inc. ("ABTI") from*

*UTEK Corporation in exchange for 200,000 shares of the Company's common stock at a price of $1.50 for a total consideration of $300,000.* ABTI's principal asset is a license agreement, which has a term of twenty-one years, to a biomass extraction and fermentation process developed at Virginia Polytechnic Institute and State University ("Virginia Tech"). ***This technology converts waste biomass mixtures to ethanol** by exploiting each mixture's unique properties to solve feedstock-specific processing problems*. The license calls for minimum royalty payments of $7,500 in year three, $15,000 in year four and $30,000 in year five and each year thereafter until the end of the license term.

*On December 6, 2005, the company entered into a research agreement with Virginia Tech for the further development and eventual commercialization of the licensed technology*. Under this agreement, the Company will pay Virginia Tech $75,689 in five payments scheduled over the course of 2006.

**Ethanol Extraction Technologies, Inc.**

*On September 30, 2004 the Company acquired 100% of the issued and outstanding common stock of Ethanol Extraction Technologies, Inc. ("EETI") from UTEK Corporation in exchange for 169,230 shares of the Company's common stock at a price of $3.25 for a total consideration of $550,000*. EETI holds a license agreement, which has a term of ten years, to a patented, Queens University, Ontario, *developed extractive fermentation technology to continually remove and isolate ethanol during the fermentation process, incorporating a strategy in which the fermentation reaction and ethanol removal occur simultaneously, thereby increasing output and reducing energy costs…*

**Superior Separation Technologies, Inc.**

*On January 11, 2005 the Company acquired 100% of the issued and outstanding common stock of Superior Separation Technologies, Inc. ("SSTI") from UTEK Corporation in exchange for 250,000 shares of the Company's common stock at a price of $3.25 for a total consideration of $812,500*. The number of shares issued was subsequently adjusted to 220,702 shares to reflect the effects of the reverse merger. SSTI holds a license agreement, which has a term of twenty years, to a patented technology developed at the U.S. Department of Energy's National Renewable Energy Laboratory designed *to effectively separate lignocellulosic material into lignin, cellulose and dissolved sugars*….

**Xylose Technologies, Inc.**

*On August 15, 2005 the Company acquired 100% of the issued and outstanding common stock of Xylose Technologies, Inc. ("XTI") from UTEK Corporation in exchange for 567,857 shares of the Company's common stock at a price of $4.20 for a total consideration of $2,385,000*. XTI holds a license agreement, which has a term of twenty years, to patented technologies based on research done

by the U. S. Department of Agriculture's Forest Products Lab (the "FPL") *designed to convert xylose into ethanol and xylitol*….

On November 30, 2005, XTI entered into a Collaborative Research and Development Agreement ("CRADA") with the FPL for the purpose of developing genetically engineered yeast strains for the production of xylitol from cellulosic biomass, such as wood chips. Under the CRADA, XTI will fund to FPL $250,000 over the course of 2006. The first payment of $62,500 was made in January 2006. [Emphasis added.]

71.    Regarding the Company's strategy of producing ethanol from biomass, the 2005 Form 10-KSB contained many statements that were substantially similar to those contained on the Company's Internet website concerning Xethanol's foreseeable growth through the commercialization of biomass ethanol.  These statements include, in part, the following:

**Iowa Expansion Strategy**

Under the first prong of our business and growth strategy we plan to take advantage of our BioFuels facility which is located on 25 acres of land with nearby corn and biomass production as well as strong local civic and business relationships with all required permits already in place. *After consideration and consultation with Harris Group, our process engineering firm, we are formulating a plan to expand the BioFuels facility from approximately 6 million gallon per year up to 25 million gallons per year. Our expansion plan envisions state-of-the-art engineering design and equipment and the integration of cutting edge processing technologies*. We believe this expansion, will optimize our investment in the facility and significantly increase profitability. We are currently evaluating contractor proposals. Of particular significance in this plan is our ability to continue to operate the plant with minimal disruptions during the expansion.

*       *       *

**Regional Co-Location Strategy**

*Under the second prong of our business and growth strategy, we intend to build ethanol production facilities co-located with, or in proximity to, waste feedstock generators in the major ethanol usage areas clustered on the Atlantic and Gulf Coasts*. To date, ethanol production has been concentrated in the corn farming states in the Midwest since corn is presently the major feedstock in ethanol production. However, ethanol buyers are clustered on the East and West Coasts around major trans-shipment points such as ports. *We intend to partner with local entities that have real estate and tanker storage facilities available at these*

*trans-shipment points and use their facilities to build local ethanol production facilities with a lower capital outlay on our part. We intend to implement proprietary bio-separation and bio-fermentation technologies at these coastal facilities that will allow us to use local biomass waste streams, such as industrial food processing wastes, in ethanol production. Our aim is to become a low-cost ethanol producer at major coastal trans-shipment points, and thus become the ethanol supplier of choice for large, local users*. [Emphasis added.]

72.    In addition to critical statements about the viability and commercialization of the Company's technologies,  the 2005 Form 10-KSB also provided statements that purported to reveal transactions that had occurred between the Company and any parties related to the Company.  To investors, these statements were also critical.

73.    In fact, because of the unique position of Xethanol as a shell registration, early-phase experimental technology company and because of the untested nature of Xethanol's biomass to ethanol processes, it was critical to investors to know any and all relations between the Company and third parties - - primarily because these relationships could weigh on the impartiality of any transactions, and they could impact the risks of loss and the risks that valuations were not as independent as they may otherwise have appeared.

74.    Accordingly, because Related Party Transactions were inexorably tied to valuation and risk analysis, the 2005 Form 10-KSB reported, in part, the following:

**NOTE 14.  RELATED PARTY TRANSACTIONS**

On January 1, 2003, the Company renegotiated an existing management services agreement with **LondonManhattan Limited,** Inc. ("LML") for the services of Christopher d'Arnaud-Taylor as its President and Chief Executive Officer (the "2003 Agreement"). Mr. d'Arnaud-Taylor is the owner of LML, a significant shareholder of the Company and the Company's Chairman of the Board of directors. Under this arrangement, the Company agreed to pay LML 1) a management fee of $10,000 per month until the first "Project Transaction", as defined below, closed, $12,000 per month from such date to the closing of the second Project Transaction, and $15,000 per month, thereafter, 2) an incentive bonus of $50,000 upon closing of the first Project Transaction $100,000 upon closing of each subsequent Project Transaction and 3) $100,000 in full satisfaction for all management and/or other services previously rendered to the

Company under previous agreements that remained unpaid and outstanding as of December 31, 2002…. During 2004, the Company made total payments to Mr. d'Arnaud-Taylor of $216,275.

***In January 2005, the Company terminated its arrangement with LML and entered into an employment agreement directly with Mr. d'Arnaud-Taylor*** as the Company's President and Chief Executive Officer for a term of three years (the "2005 Agreement"). ***Under the 2005 Agreement, the Company pays Mr. d'Arnaud-Taylor a monthly fee of $15,000. During 2005, the Company made total payments to Mr. d'Arnaud-Taylor of $281,075.***

On January 1, 2003, the Company entered into formal consulting services agreement with **Jeffrey Langberg & Associates** ("Langberg"). Langberg is a significant shareholder of the Company and became a member of the Board of directors in 2005. Under this agreement, the Company agreed to pay Langberg 1) consulting fees at the rate of $10,000 per month until such time as the first Project Transaction closes, at the rate of $12,000 per month from such date to the closing of the second Project Transaction, and at the rate of $15,000 per month thereafter, 2) an incentive bonus of $50,000 upon closing of the first Project Transaction and $100,000 upon closing of each subsequent Project Transaction thereafter, and 3) a finder's fee for the gross proceeds from the sale of securities to investors introduced to the Company and 4) $100,000 in full satisfaction for all consulting and/or other services previously rendered and not paid by the Company. During 2004, the Company made total payments to Langberg of $334,525 including finder's fees of $145,025 which were recorded as a reduction to Additional paid-in-capital.

In February 2005, the Company re-negotiated its consulting services agreement with Langberg, pursuant to which Mr. Langberg agreed to provide general business advisory services to the Company. Under this agreement, the Company agreed to pay Mr. Langberg a consulting fee of $15,000 per month and a $225,000 sign-on bonus. Mr. Langberg is also eligible to receive performances bonuses at the discretion of the Board of directors. Mr. Langberg agreed to waive any compensation otherwise payable to him as a director of the Company. ***During 2005, the Company made total payments to Langberg of $649,147.***

\* \* \*

***In October 2004, the Company began sharing office space in New York City with other affiliated companies under a sublease with Xethanol Management Services, LLC ("XMS") which is a single member LLC controlled by Mr. Langberg.*** Under this arrangement, Xethanol is currently paying approximately ***$10,400 per month, plus reimbursement of other costs***, in sublease payments on a month to month basis. As of December 31, 2005 total payments made were $99,806…

**[Emphasis added].**

* * *

## ITEM 12.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Management and Consulting Services Agreements

In September 2001, Old Xethanol entered into a Management Services Agreement with London Manhattan Limited, Inc., a corporation controlled by Christopher d'Arnaud-Taylor, our Chairman and Chief Executive Officer, for the senior corporate management services of Mr. d'Arnaud-Taylor as its President. Pursuant to this agreement, Old Xethanol agreed to pay London Manhattan Limited, Inc. a monthly management fee, an incentive bonus based on the closing of project transactions and a percentage of our earnings before interest, depreciation and amortization. In connection with the reverse merger and private offering, we and London Manhattan Limited, Inc. agreed to terminate the Management Services Agreement, with no further liability or obligation on the part of the parties (except for certain earned, accrued fees), effective as of the closing of such transactions. Mr. d'Arnaud-Taylor entered into an employment agreement directly with us, as described in "Item 10. Executive Compensation - Employment Agreements."

In January 2003, Old Xethanol entered into a Consulting Services Agreement with Jeffrey Langberg & Associates, pursuant to which Jeffrey S. Langberg, now one of our directors, provided business advisory services. Under this agreement, Old Xethanol had agreed to pay Jeffrey Langberg & Associates a monthly consulting fee, an incentive bonus based on the closing of project transactions and a fee for introductions to investors. In connection with the reverse merger and private offering, we and Jeffrey Langberg & Associates agreed to terminate the Consulting Services Agreement, with no further liability or obligation on the part of the parties or of us (except for certain earned, accrued fees), effective as of the closing of such transactions. Under the January 2003 agreement, we recorded consulting fees to Mr. Langberg of $389,025 in 2004 and $246,270 in 2003.

In February 2005, we entered into a Consulting Services Agreement with Mr. Langberg, pursuant to which Mr. Langberg agreed to provide general business advisory services. Under this agreement, we agreed to pay Mr. Langberg a monthly consulting fee of $15,000 per month and a sign-on bonus of $225,000. Mr. Langberg is also eligible to receive performances bonuses at the discretion of the Board of directors as well as equity-based awards under the 2005 Plan. Mr. Langberg agreed to waive any compensation otherwise payable to him as a director of our company. During 2005, we recorded total consulting fees to Mr. Langberg of $455,000.

75.     The 2005 Form 10-KSB also reported that the Company maintained a purported system of internal controls and procedures that were designed to assure that defendants' statements about Xethanol were true, accurate and correct.  Accordingly, the Form 10-KSB also stated, in part, the following:

**ITEM 8A.   CONTROLS AND PROCEDURES**

Disclosure controls and procedures are our controls and other procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. ***Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file under the Exchange Act is accumulated and communicated to our management, including principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.***

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. The evaluation process, including the inherent limitations on the effectiveness of such controls and procedures, is more fully discussed below. ***Based upon our evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer have concluded that as of the end of the period covered by this report, notwithstanding the prior existence of certain material weaknesses, our disclosure controls and procedures were effective.***

*         *         *

Prior to Old Xethanol's "reverse merger" transaction with Zen in February 2005, during which time the foregoing errors in financial reporting were made, Old Xethanol had no formal audit committee, very limited accounting personnel and outsourced significant accounting functions. Reliance on such limited resources impaired Old Xethanol's ability to provide for segregation of duties and the ability to ensure consistently complete and accurate financial reporting, as well as effective disclosure controls and procedures.

The material weaknesses were discussed in detail among management and our current independent registered public accounting firm in the first quarter of 2005 and, as a result of such discussions, ***we promptly implemented a series of steps to improve our financial reporting and disclosure controls and procedures and to***

***remedy the material weaknesses identified.*** Such steps included putting in place personnel, processes, technology and other resources appropriate to support our financial reporting and disclosure controls and procedures. In this regard, we (1) appointed a chief financial officer, with financial accounting and Exchange Act reporting experience, in April 2005 to oversee all of our accounting and reporting functions, (2) consolidated all of our plant accounting, reporting and administrative functions at our Xethanol BioFuels facility under a local plant controller, (3) implemented a system of formal procedures and controls to enable the accurate and timely gathering, recording, processing and "up-the-ladder" reporting of information, including formal monthly reporting requirements and regular conferences among internal accounting personnel and senior financial management, (4) consolidated all public reporting functions at our principal executive offices under the supervision of our Chief Financial Officer, and (5) on July 28, 2005, formed an audit committee of the board of directors composed entirely of independent directors…

***Because all of the foregoing steps were implemented by our company prior to the end of the period covered by this report, our Chief Executive Officer and Chief Financial Officer were able to carefully evaluate the effectiveness of these new measures, together with our other disclosure controls and procedures, at the end of the period covered by this report.*** On the basis of such evaluation, our Chief Executive Officer and Chief Financial Officer reached the conclusion set forth above that, as of the end of the period covered by this report, **notwithstanding the prior existence of certain material weaknesses; our disclosure controls and procedures were effective**… [Emphasis added.]

76.     Because of the experimental nature of much of the Company's technologies, the skills and abilities of the Company's officers and directors were of critical importance to investors.  Thus, in addition to the foregoing, the 2005 Form 10-KSB described the work experience of the Company's key officers and directors, in part, as follows:

**Christopher d'Arnaud-Taylor**, Chairman, President and Chief Executive Officer, has worked with Old Xethanol since August 2000. He became our Chairman, President and Chief Executive Officer on February 2, 2005. ***He is an international merchant banker and entrepreneur who gained global senior corporate executive experience with multinationals including Unilever, Reed Elsevier, Northrop Grumman** and TKM Trading. **He has directed the strategy, operations and financial affairs of companies in the United States, Europe, Africa, the Middle East and Asia and managed the development and execution of corporate turnarounds and entrepreneurial ventures worldwide***. Mr. d'Arnaud-Taylor has been a Director and President of a private merchant banking firm, London Manhattan Securities, Inc., for more than the past five years. London Manhattan has worked with entrepreneurs and established companies in

forging new enterprises and realizing the potential of established businesses through mergers and acquisitions, joint ventures and strategic alliances**. London Manhattan** has participated as managing co-venturer in special situations where its direct involvement led to improving the operating results and strategic focus of an underperforming company or new business venture. Mr. d'Arnaud-Taylor also presently serves as a director of Metamorphix Global Inc, a developer of advanced precast concrete technology that emulates the patterns of natural stone, and Xeminex, Inc., an early-stage producer of lead and zinc concentrates. Previously, Mr. d'Arnaud-Taylor served as CEO of several global trading companies operating primarily throughout the developing world trading in forest products, precision equipment and building materials. *He has consulted extensively with leading defense contractors in the USA and Europe on countertrade and defense offset performance*. Mr. d'Arnaud-Taylor obtained his M.B.A. from the London Business School having completed additional graduate business studies as an exchange scholar in international finance and development economics at the Ecole des Hautes Etudes Commerciales in Paris, France and corporate finance at New York University's Stern School of Business. He previously studied economics, government and law at the University of Exeter, England.

\* \* \*

**Jeffrey S. Langberg**, Director, became a member of our board of directors on February 28, 2005. Prior to that, since January 1999, Mr. Langberg had been a financial and business development advisor to the Chairman of Old Xethanol. For more than the past five years, Mr. Langberg has been an independent investment banker and business development advisor to public and privately-held companies involved in a broad range of industries. Mr. Langberg currently serves as an investment banker and business development advisor to Metamorphix Global Inc., a developer of advanced precast concrete technology that emulates the patterns of natural stone; United Energy Corp., a manufacturer of specialty chemicals for the oil services industry; Deep Marine Technology, Inc., a designer of high technology single operator submarines for deep sea work; and Hybed Fuel Systems, Inc., a marketer of energy savings technology in the alternative fuels industry. Mr. Langberg graduated from the University of Pennsylvania's Wharton School of Finance and received a law degree from Fordham University Law School.   [During 2005, Xethanol also recorded consulting fees to Langberg of $455,000 and provided health insurance coverage to him at a cost of $14,014.]

**Louis B. Bernstein,** Director, became a member of our board of directors on June 2, 2005. Mr. Bernstein is currently Assistant General Counsel of Pfizer Inc., where he has been an attorney for 29 years. In this capacity, Mr. Bernstein has managed product liability claims and litigation involving prescription pharmaceuticals, orthopedic implants and other medical devices. Mr. Bernstein also provides due diligence, financial modeling, market research, acquisition candidate profiling and strategic partnering advice and assistance to clients in the life sciences and specialty chemical sectors. In addition, Mr. Bernstein has related

experience in advertising and labeling review, legislative analysis and consultation regarding new products and investments, food and drug regulatory matters and commercial transactions.

*   *   *

**James Stewart,** Vice President - Plant Operations and General Manager - Xethanol BioFuels (subsidiary of Xethanol BioEnergy, Inc.). ***Mr. Stewart has more than 23 years of experience in ethanol production in the United States and throughout the world. In addition to extensive consulting experience, Mr. Stewart has been associated with the ethanol plant in Blairstown, Iowa since its inception and throughout its operations, including serving as general manager of the plant during its operation from 2000 through 2002***. Mr. Stewart has extensive experience in all aspects of plant operation including regulatory affairs, staffing, engineering, feedstocks and emergency planning. Prior to his work at the Xethanol BioFuels plant, Mr. Stewart worked as a plant manager and in technical advisory roles at more than ten other ethanol production plants. [Emphasis added.]

77.     Because the truth and transparency of defendants' statements was so critical to investors' ability to value and evaluate the Company, the statements by defendants that purported to attest to the veracity and completeness of these disclosures were also of critical importance. Accordingly, the 2005 Form 10-K contained Certifications by defendants Taylor and Bellone, Required by Exchange Act Rule 13a-14(a), that stated the report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made… not misleading [and], the financial statements… fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer ….***" With respect to internal controls and procedures, defendants Taylor and Bellone further certified that they were responsible for having "***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.***"

37

78.   In addition, the Form 10-KSB for 2005 contained certifications by defendants Taylor and Bellone pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that certified that "[t]*he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.* "  [Emphasis added.]

79.   The statements about the Company that appeared in the *Fortune Small Business Magazine* article, Xethanol's January 31, 2006, and February 27, 2006, releases and those statements contained in the Company's 2005 Form 10-KSB, referenced above, were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others, which are also described in detail in the Section entitled "Concealed, Adverse Facts Concerning the Company" above:

(a)   Throughout the Class Period, Xethanol utterly lacked the technological capability to make ethanol from biomass in a commercially viable manner; in truth, various former Xethanol employees confirmed the technology is still not available today;

(b)   Therefore, the Company was not operating according to plan, and Xethanol could not achieve the near-term commercialization of biomass ethanol production;

(c)   Throughout the Class Period, the Company was not being run by management with credibility and a high standard of ethics, and defendant Taylor did not have significant management experience at major domestic corporations that he purported to bring to bear at Xethanol.  In truth, defendant Taylor had fabricated his resume and never worked at companies such as Unilever, Northrop Grumman, and Reed Elsevier.  At least one Xethanol former employee felt placed in "a bad ethical situation" and told management the former employee "would not lie" about the technology;

(d)     Many of the Company's initial investors have very troubling histories involving stock fraud, market abuse, breach of fiduciary duty and breach of contract;

(e)     The Company also had myriad improper third-party transactions that were not properly disclosed;

(f)     The Board members were "not straight with each other" and "did not share vital information" with all their members;

(g)     The Company's Hopkinton, Iowa plant was *not* being refurbished but, rather, lay abandoned and neglected with no current water or sewer service and no employees working at the site;

(h)     In fact, none of the Company's plants produced biomass-to-ethanol in a commercially viable manner, and all but one (which produced ethanol solely from corn) were dormant at best and "mostly just a big pile of industrial crap" at worst;

(i)     The Spring Hope, North Carolina plant was purchased from an owner who had a plan to create an "illusion" that Xethanol was commencing commercialization of biomass-to-ethanol production, when in fact Xethanol would not be commencing such commercialization;

(j)     Defendant Bellone's wife, Sarah Smith, was the sole driving force behind Goldman Sachs' decision to make a market in Xethanol stock and no one at Goldman Sachs outside of the New York office was aware of Smith's secret connection to Xethanol;

(k)     Xethanol did not have adequate systems of internal operational or financial controls, and therefore Xethanol's operational and financial reports were not true, accurate or reliable;

(l)     Defendants materially overstated the Company's profitability by underreporting Xethanol's true cost of completing a biomass to ethanol production facility and

by failing to make proper, timely adjustments to the Company's stated financial reports and balance sheet;

(m)   The Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules; and

(n)   As a result of the foregoing, the risk of investing in Xethanol was materially higher than defendants disclosed and than investors could discern through a reasonable due diligence investigation.

80.   The representations and reassurances contained in the 2005 Form 10-KSB had their intended effect.  By the beginning of April 2006, shares of the Company continued to rally. Moreover, Xethanol shares continued to rally immediately prior to and following a string of additional positive announcements by defendants.  Accordingly, on April 4, 2006, over 1 million shares of Xethanol traded to a high of $8.40 per share after defendants announced that the Company had negotiated to raise up to another $46 million in new private equity funding.

81.   In connection with the announcement of this additional funding, defendants published a release that stated, in part, the following:

**HEADLINE: Xethanol Raises up to $46 Million in Equity Capital**

Xethanol Corporation (OTCBB:XTHN), a biotechnology driven ethanol company, announced today that it has signed ***definitive agreements for up to $46 million in two separate equity financing transactions.***

Under the terms of the first transaction, Xethanol will initially receive approximately $30 million from the issuance of shares of its common stock to institutional and private investors. Additionally, over the next three years, Xethanol could receive up to an additional $10.6 million from the exercise of warrants issued to these investors…. As part of this transaction, the company has agreed to file a resale registration statement on Form SB-2 with the Securities and Exchange Commission within 30 days following the closing for the purpose of registering for resale the shares of common stock sold in the financing.

40

Under the terms of the second transaction, ***Xethanol will initially receive $4 million from the issuance of shares of its common stock to Goldman Sachs & Co. Additionally, over the next three years, Xethanol could receive up to an additional $1.4 million from the exercise of warrants issued to Goldman Sachs….***

Christopher d'Arnaud-Taylor, Chairman and CEO of Xethanol stated "***We have been steadily building our business opportunities over the last year in preparation for this significant capital infusion which will now allow us to execute these plans. They include the expansion of our existing facilities, new plants in the southeast and northeast regions, and, most importantly, the integration and commercialization of our technologies. Having this capital really marks the beginning of our ability to realize our stated goal of being a leader in the emerging biomass-to-ethanol industry by employing cutting edge technologies in the conversion of low-cost biomass and other waste streams***."

Mr. d'Arnaud-Taylor further stated "The Company is extremely fortunate to gain the support of the investors participating in these financings. ***It is gratifying to see our business model validated.***" [Emphasis added.]

82.     Following the publication of this announcement, on April 5, 2006, shares of the Company traded to a high of over $10.00, again on volume of over 1 million shares traded.  By April 10, 2006, the Company's shares continued to trade at above 1 million shares per day, climbing to $12.35 per share.  The following day, April 11, 2006, over 1 million more shares traded at that level after defendants announced that Xethanol was exploring strategic growth opportunities in California, consistent with its Phase II biomass commercialization growth strategy.

83.     At that time, defendants published a release that stated, in part, the following:

**Xethanol Explores Strategic Growth Opportunities in California; Company Hires Christopher Dillow to Increase Corporate Visibility in California**

Xethanol Corporation (OTCBB:XTHN), a biotechnology driven ethanol company, announced today that it has hired Christopher Dillow, a Newport Beach based venture capitalist, ***to explore strategic growth opportunities for Xethanol in the large and expanding California ethanol market.***

**Christopher d'Arnaud-Taylor**, Xethanol's Chairman and Chief Executive Officer, commented: "As we are currently focused on our east coast regional roll-

out, we are not yet ready to tackle the California ethanol market. However, ***now is the time to develop our market penetration strategy in that region. We have therefore hired Christopher Dillow to assist Xethanol in gaining greater visibility in the California market and to identify and evaluate potential strategic partners for us to team with***. We have enjoyed an extensive and productive working experience with Christopher and we are delighted to formalize this relationship for California."

**Mr. d'Arnaud-Taylor continued**: "California's demand for ethanol is about one third of the current US market.... ***We expect that California will be a huge opportunity for us to deploy cutting edge technologies for the conversion of low cost biomass and other waste streams to ethanol***." [Emphasis added.]

84.     The statements made by defendants and contained in the Company's April 4, 2006 release and those statements contained in the Company's April 11, 2006 release, were materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶79, *supra.*

85.     On April 17, 2006, Xethanol stock traded to $14.50 per share on volume of over 1.6 million shares traded after defendants announced that they had closed on the $46 million equity financing.  That day, defendants also published a release announcing the financing.

86.     On April 24, 2006, shares of the Company traded above $15.50 after defendants announced that Xethanol had entered into a "strategic equity" arrangement with H2Diesel, Inc. to produce "BioDiesel" fuel.  The prior trading day, April 21, 2006, defendants published a release that stated, in part, the following:

**Xethanol Enters Biodiesel Market**

**Xethanol takes strategic equity stake in H2Diesel, Inc. to manage and deploy advanced BioDiesel technology and enters into sublicense agreement to produce BioDiesel fuel**

\*   \*   \*

**Lee Rosen**, Chief Executive Officer of H2Diesel, said, "I am very pleased to have entered into such a comprehensive and strategic agreement with Xethanol. We believe that Xethanol's proven expertise in the alternative fuel sector and

42

commitment to processing waste streams, combined with H2Diesel's technology, will drive rapid and widespread deployment of our unique system for producing biodiesel. We further believe that our technology, which reduces the capital expense in scaling biodiesel production and represents a quantum leap in simplifying conversion of oils into biodiesel, will make a meaningful contribution to our country's move towards energy independence."

**Christopher d'Arnaud-Taylor,** Xethanol's Chairman and Chief Executive Officer, commented: "Xethanol has been able to identify and acquire cutting edge technologies for converting biomass waste streams into ethanol. *The H2Diesel technology, and our commitment to its deployment, reinforces our mission to be in the forefront of innovation in the biofuels sector. It further leverages our core competency of integrating technologies for converting America's prolific waste streams into biofuels*. We believe that the H2Diesel system is superior to current processing techniques and will therefore make a significant contribution to the continued growth of this industry."

**Mr. d'Arnaud-Taylor continued:** "*This H2Diesel strategic initiative complements our core ethanol business.* We have been committed to expanding our business into other biofuels besides ethanol and having a presence in the biodiesel market has always been a key part of our strategy. Th*e H2Diesel technology is ready to commercialize, making this an optimal strategic alliance*. Biodiesel, the other mainstream biofuel along with ethanol, is currently the most rapidly growing alternative fuel market in the world. Current biodiesel production in the USA is approximately 100 million gallons per year. The U.S. Department of Agriculture estimates that US demand for biodiesel fuel will exceed 800 million gallons by 2010. Based on H2Diesel technology advantages of scalability and simplicity and production cost*, we are confident that the H2Diesel-Xethanol alliance is well positioned to capture a significant share of this exploding market.*" [Emphasis added.]

87.     On April 28, 2006, more than 1 million shares of Xethanol stock traded after defendants announced that the Company was set to expand in New England after forming an alliance with Global Energy Management.  At that time, defendants published a release that stated, in part, the following:

**Xethanol Set to Expand in New England; Company Forges NewEnglandXethanol Strategic Alliance with Global Energy Management**

Xethanol Corporation (OTCBB:XTHN), a biotechnology driven ethanol company, announced today that it has organized NewEnglandXethanol LLC accelerating its growth plans to roll out ethanol production throughout the East Coast. NewEnglandXethanol will be a strategic alliance between Xethanol and

43

**Global Energy Management LLC**. Its mission is to develop ethanol production in Connecticut, Massachusetts, Rhode Island, New Hampshire, Maine and Vermont. This follows the previously announced CoastalXethanol initiative to expand ethanol production throughout Georgia and the South East region.

NewEnglandXethanol will focus on a region with a strong environmental heritage and rich in biomass residues. NewEnglandXethanol plans to open several ethanol plants throughout the region deploying Xethanol's proprietary technologies. Moreover, NewEnglandXethanol may co-locate biodiesel production in its facilities under Xethanol's sub-license from H2Diesel, Inc.

*   *   *

**Mr. d'Arnaud-Taylor**, Chairman and CEO of Xethanol commented: *"This alliance between Xethanol and Global Energy Management leading to the formation of NewEnglandXethanol is the second milestone in our East Coast regional roll-out plan*. We are confident that Lee and his team's experience in developing projects throughout the northeast and their Native American economic relationships in particular will help catapult NewEnglandXethanol into fast track production of ethanol." [Emphasis added.]

88.    The statements made by defendants and contained in the Company's April 21, 2006 release and those statements contained in the Company's April 28, 2006 release, were materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated in ¶79, *supra.*

89.    On May 15, 2006, defendants filed with the SEC the Company's Form 10-QSB for the first quarter ended March 31, 2006, signed and certified by defendants Taylor and Bellone.  The 1Q:06 Form 10-Q stated, in part, the following:

> *The Company plans to optimize the use of biomass in the renewable energy field and convert biomass that is currently being abandoned or land filled into ethanol or other valuable co-products. The Company's business model is to deploy proprietary biotechnologies that will extract and ferment sugars trapped in biomass waste concentrations in a cost effective manner by locating ethanol plants closer to biomass sources and in proximity to urbanized high-demand ethanol markets.* [Emphasis added].

90.    The 1Q:06 Form 10-QSB also contained statements concerning the Company's related party transactions, as follows:

**NOTE 6.   RELATED PARTY TRANSACTIONS**

In February 2005, the Company entered into a Consulting Services Agreement with Jeffrey S. Langberg, a stockholder and member of the Company's Board of Directors, pursuant to which Mr. Langberg agreed to provide general business advisory services. Under this agreement, the Company pays Mr. Langberg a monthly consulting fee of $15,000 and Mr. Langberg is eligible to receive awards under the Company's 2005 Incentive Compensation Plan. Mr. Langberg does not receive any compensation otherwise payable to him as a director. During the current quarter, Mr. Langberg received consulting fees of $45,000 and was awarded a performance bonus of $400,000 payable during 2006.

91.     The Company's 1Q:06 Form 10-QSB also contained statements concerning the Company's internal controls and procedures, as follows:

> *[O]ur Chief Executive Officer and Chief Financial Officer have concluded that as of the end of the period covered by this report, notwithstanding the prior existence of certain material weaknesses, our disclosure controls and procedures were effective.*
>
> *There has been no change in the Company's internal controls over financial reporting during the fiscal quarter ending March 31, 2006* that has materially affected, or is reasonably likely to materially affect, the Company's internal controls over financial reporting. [Emphasis added.]

92.     The 1Q:06 Form 10-QSB also contained certifications by defendants Taylor and Ballone that purported to attest to the veracity and completeness of Xethanol's disclosures and controls.  The "Joint Certification of Principal Executive Officer and Principal Financial Officer Required by Exchange Act Rule 13a-14(b)," contained in the 1Q:06 Form 10-QSB stated in part the following: ***The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***"  [Emphasis added].

93.     The statements made by defendants and contained in the Company's 1Q:06 Form 10-QSB were materially false and misleading and were known by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶79, *supra.*

94.     During the four trading days between May 19 and May 24, 2006, over 5.75 million Xethanol shares traded.  Fueling that momentum, on May 24, 2006, defendants published a release that announced that the Company had signed a letter of intent to acquire another plant, located in Augusta, Georgia.   This release stated, in part, the following:

**Xethanol to Acquire Plant in Georgia; Proposed Purchase of Pfizer Manufacturing Complex Through CoastalXethanol Subsidiary**

Xethanol Corporation (OTCBB:XTHN), a biotechnology driven ethanol company, announced today that its CoastalXethanol subsidiary has signed a letter of intent with Pfizer, Inc. (NYSE:PFE) to purchase Pfizer's pharmaceutical manufacturing complex located in Augusta, Georgia.…

The state of the art, 40 acre site includes: an 89,100 square foot manufacturing facility, a 25,000 square foot warehouse facility, 7,300 square feet of laboratory space, and 16,000 square feet of offices and conference rooms. CoastalXethanol intends to retrofit the site to produce 35 million gallons per year of ethanol. *The facility will produce ethanol from cellulosic and other biomass waste streams generated by industrial producers in the surrounding areas. This biomass-to-ethanol facility will be the first of its kind in the region*…

\*   \*   \*

**Mr. d'Arnaud-Taylor**, Chairman and CEO of Xethanol commented: "The proposed purchase and conversion of this facility serves as *an excellent template of our strategy of acquiring existing industrial plants and adapting them to produce ethanol and biodiesel. Because of the size and existing infrastructure of this facility, it gives Xethanol an exceptional platform from which to launch its CoastalXethanol production initiative in a meaningful way. We believe this will be the first of several significant acquisitions in the Southeast*. Xethanol appreciates Mayor Copenhaver's and Augusta's enthusiasm and assistance. *The Mayor and his team were quick to grasp that our waste to ethanol technologies not only create renewable energy in the region, but also help solve waste disposal issues associated with the forestry industry."*

 [Emphasis added.]

95.     The Company's purported plans for growth in the Southeastern region of the United States were reinforced later, on May 31, 2006, when defendants published a release announcing an "alliance" with Coastal Energy Development.  This release stated, in part:

**Xethanol Set for Southeastern U.S. Growth; Company Solidifies CoastalXethanol Strategic Alliance with Coastal Energy Development**

Xethanol Corporation (OTCBB:XTHN), a biotechnology driven ethanol company, announced today that *it has completed the organization of CoastalXethanol, LLC, continuing to bolster its growth plans to roll out ethanol production throughout the East Coast. CoastalXethanol will be a strategic alliance between Xethanol and Coastal Energy Development, Inc. Its mission is to develop ethanol production throughout Georgia and the Southeast region*....

CoastalXethanol will focus on a region with a strong environmental heritage and rich in biomass residues. *CoastalXethanol plans to open several ethanol plants throughout the region, deploying Xethanol's proprietary technologies*. Moreover, CoastalXethanol may co-locate biodiesel production on its facilities under Xethanol's sub-license from H2Diesel, Inc.

\*   \*   \*

CoastalXethanol is also actively pursuing a second opportunity in Savannah, Georgia for a proposed 20 million gallon facility, also using biomass waste streams. CoastalXethanol has acquired a lease/purchase option on a potential site.

\*   \*   \*

**Christopher d'Arnaud-Taylor**, Chairman and CEO of Xethanol commented: "*Forming alliances with experienced, knowledgeable partners is key to our regional expansion strategy*. The team at Coastal Energy Development has the requisite diversity of skills to develop a significant regional presence. *The Coastal Energy team has been critical in the acquisition of the recently announced Augusta facility from Pfizer as well as the potential opportunity in Savannah. We look forward to working with Chandler Hadlock and his group in finalizing this important acquisition and developing future projects*."

[Emphasis added.]

96.     The statements made by defendants and contained in the Company's May 24, 2006 release and those statements contained in the Company's May 21, 2006 release, were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶79, *supra.*

97.     Again, on June 15, 2006, volume in Xethanol share trading spiked after defendants published a release, the prior day, that announced that the Company had purportedly

47

acquired additional biomass technologies essential for the conversion of biomass into ethanol.

At that time defendants published a release stating, in part, the following:

> **Xethanol Acquires Advanced Biomass Gasification Technologies, Inc. from UTEK; Acquisition Includes Exclusive Worldwide License to Assist in Integration and Commercialization of the Technology**
>
> Xethanol Corporation … announced today that Xethanol has acquired Advanced Biomass Gasification Technologies, Inc. (ABGT), a wholly owned subsidiary of UTEK, in a stock transaction.
>
> ABGT holds the exclusive worldwide license for MicroGasification technology …. The MicroGasifier produces syngas from carbon matter. Syngas drives a portable, power generation system that provides energy solutions for companies and municipalities with simultaneous waste disposal and power needs. Xethanol and EERC are mutually funding a Cooperative Research and Development Agreement (CRADA) to further apply the MicroGasifier in the production of ethanol. EERC will perform system integration of the MicroGasifier for customers.
>
> *"In acquiring ABGT, Xethanol's objective is to provide a lower cost alternative to steam boiler power generation with a small footprint waste-to-energy technology utilizing low-cost biomass feedstocks and waste streams,"* said Mr. *Christopher d'Arnaud-Taylor,* Chief Executive Officer of Xethanol. He added, "Creating energy from industrial and biomass waste such as lignin, a byproduct of cellulosic ethanol production, and is a critical component of our business model most especially in light of the high cost of oil and natural gas."
>
> **Mr. d'Arnaud-Taylor continued**, "This acquisition establishes a strategic alliance between Xethanol and EERC, a leader in the field of gasification, and represents *a major opportunity to enter the market with a powerful waste-to-energy technology with broad applications* in a multi-billion dollar global industry." [Emphasis added.]

98.     During the three trading days between June 21 and 23, 2006, another almost two million Xethanol shares traded, following a report by the *New York Post* that highlighted the Company.  In addition to reporting that Xethanol shared an office address with defendant Taylor's London Manhattan Securities at 1185 Avenue of the Americas, *The Post* report also described the Company as possessing technology to convert garbage and plant waste into ethanol fuel.

99.    On June 26, 2006, defendants published an unusual release that directly responded to allegations that had begun to surface in the market, that questioned, among other things, the formation of the Company.  This release titled, "Xethanol Sets the Record Straight" stated, in part, the following:

**HEADLINE: Xethanol Sets Record Straight Following Misleading Statements by Motley Fool**

Xethanol Corporation (AMEX:XNL) today issued the following in response to inaccurate information that was included in a number of Internet articles during the past several days.

Following an article published by The Motley Fool on Friday, June 23, that carried a number of inaccurate and misleading statements about the company, Xethanol said:

The Motley Fool article authored by Ryan Fuhrmann has a number of inaccuracies and misleading statements, foremost of which is a quote attributed to the New York Times, which in reality is taken out of context from a New York Post story that appeared on Thursday, June 22. More importantly, the Motley Fool article, which has since been referenced by other online blogs further perpetuating the inaccuracies, suggests that Xethanol was formed simply to capitalize on the ethanol interest in today's market.

***Nothing is further from the truth. Xethanol was formed in 2001 with the express strategy to develop its business in the emerging biomass-to-ethanol industry. Since 2001, Xethanol has been engaged in the business of developing and operating facilities for the production of ethanol. It continues to be engaged only in that business and in the development of technologies and facilities for the production of other biofuels.***

***Like many other successful companies, Xethanol merged with a reporting shell corporation so that its shares could be publicly traded. The Company subsequently registered its outstanding shares with the SEC and applied for the listing of its shares on the American Stock Exchange. The Company's common stock was approved for listing on June 16 and is now being traded on the AMEX.***

***All the prior businesses of Zen were discontinued when Xethanol merged with Zen. None of Xethanol's management were involved with Zen or its businesses and none of Zen's management or owners are involved with Xethanol. Zen's prior businesses are irrelevant to Xethanol's operations or performance and Xethanol's financial statements reflect only the operations of Xethanol.***

49

> *Xethanol continues to successfully operate and expand its business….*
>
> *The Motley Fool article is misleading and does an unjustified disservice to Xethanol, its shareholders and the investing public. The misleading statements in the article were so egregious that Xethanol felt compelled to respond.*

[Emphasis added.]

100.   The following day, June 27, 2006, defendants published another release that announced the Company's purported "progress in New England regional expansion" that stated, in part, the following:

**Xethanol Progresses in New England Regional Expansion**

Xethanol Corporation (AMEX:XNL), a biotechnology driven ethanol company, announced today that it has joined with Global Energy and Management, LLC to form a new venture to develop ethanol production in Connecticut, Massachusetts, Rhode Island, New Hampshire, Maine and Vermont. The new venture, known as NewEnglandXethanol, LLC or NEX, plans to open several ethanol plants throughout the region deploying Xethanol's proprietary technologies. Additionally, Xethanol may co-locate biodiesel production in its facilities under Xethanol's sub-license from H2Diesel, Inc.

*   *   *

**Christopher d'Arnaud-Taylor**, Chairman and CEO of Xethanol commented: *"Strategic partnerships with companies like Global Energy will enable us to accelerate our production goals and reach our stated long-term objectives of making ethanol from regionally sourced biomass and waste streams.* While Xethanol's core competence is in operating facilities and integrating technology, Global Energy's team brings complementary skills in identifying and securing suitable project sites, in procuring government support as well as in spearheading the permitting process."

[Emphasis added.]

101.   The statements made by defendants and contained in the Company's June 15, 2006, its June 26, 2006 and its June 27, 2006 releases were each materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶79, *supra.*

102.    As late as July 6, 2006, shares of the Company continued to trade above $10.00

per share, after defendants announced, the prior day, that Xethanol had selected PRAJ

Technology to design a new 35 million gallon ethanol facility at its Blairstown, Iowa site.  That

release stated, in part, the following:

**Xethanol Selects PRAJ Technology for New 35 Million Gallon Ethanol Facility at its Blairstown Site in Iowa**

Xethanol Corporation (AMEX:XNL), a biotechnology driven ethanol company, announced today that it has selected ethanol production technology developed by PRAJ Industries Ltd. for a new ethanol facility at its Blairstown, Iowa site. ***PRAJ technologies will include detailed engineering services, process design and licensing as well as the supply of vital sections of the process plant. The new facility will have a nameplate capacity of 35 million gallons per year of fuel ethanol and will be developed alongside the company's existing plant which will continue to operate at maximum capacity.***

**Christopher d'Arnaud-Taylor**, Chairman and CEO of Xethanol commented, ***"PRAJ is a world leader in bio-ethanol technology, providing cutting edge design and construction and state-of-the-art engineering for ethanol production from a range of feedstocks***. After a rigorous evaluation of their technology platform, including visiting PRAJ facilities in India and Colombia, we decided to commit to PRAJ Technology***. PRAJ's technology platform is highly adaptable to different feedstocks***. We are very pleased to be working with PRAJ on this significant project and we look forward to developing multi-feedstock plants using cellulosic biomass in the future."

**Mr. d'Arnaud-Taylor further commented**, "Our Blairstown site in Iowa is over 25 acres with ample space to support this significant expansion. The site is already permitted for ethanol production with much of the required infrastructure in place and feedstock readily accessible. ***We expect this plant to come on line in the second half of 2007. Thereafter, we will retrofit our current 6 million gallon facility at Blairstown by adopting our technology platform and converting that plant to cellulosic feedstocks." He added, "Expanding Blairstown is a critical step in achieving our planned production goals***. When completed, the two facilities at our Blairstown site will be running at 41 million gallons per year with state of the art technology and the flexibility to run a variety of feedstocks. ***We are making great progress in integrating our cellulosic technologies for full commercialization."***

103.    Similarly, on July 20, 2006, defendants again published a release that announced

that the Company's 50 million gallon cellulosic ethanol facility at Augusta, Georgia, slated for

51

production by mid-2007, also utilized PRAJ Technology to provide engineering services.  This release stated, in part, the following:

**New 50 Million Gallon Cellulosic Ethanol Facility at Augusta, Georgia Site to Begin Production by Mid 2007; PRAJ Technology and The Facility Group Selected to Assist in Engineering and Construction**

Xethanol Corporation (AMEX:XNL), a biotechnology driven ethanol company, announced today that it has completed its due diligence process on its previously announced acquisition of a Pfizer pharmaceutical manufacturing *complex in Augusta, Georgia and will be closing on the complex within 30 days. The company also announced plans to construct a 50 million gallon per year cellulosic ethanol plant on the site which would begin producing ethanol by mid-2007.*

*PRAJ Technology, an India based world leader in bio-ethanol technology will provide detailed engineering services, process design and licensing as well as the supply of vital sections of the process plant*. PRAJ was also selected to provide the same services for Xethanol's recently announced new 35 million gallon per year facility at its Blairstown, Iowa site.

\*   \*   \*

**Christopher d'Arnaud-Taylor**, Chairman and CEO of Xethanol, commented "Having completed our due diligence on the site, we decided to raise the capacity of this plant to 50 million gallons per year*. It is being designed to run on a variety of feedstocks and we are already securing the necessary feedstock streams from the forest products industry to run at capacity when we begin production by mid-2007. By combining Xethanol's proprietary technologies with those of PRAJ, we believe that we will have achieved our goal of being a low-cost producer of fuel ethanol from cellulosic materials.* With our recent announcement of expanding our Blairstown, Iowa facility to 41 million gallons per year and bringing Augusta on line with 50 million gallons per year, our stated production goals are within our sights."

Mr. **Taylor further went on to say** "We have selected two leading companies to facilitate the expeditious construction of the Augusta plant. *PRAJ is a world leader in bio-ethanol technology, providing cutting edge design and construction and state-of-the-art engineering for ethanol production from a range of feedstocks*. The Facility Group is one on the most highly regarded facilities contractors in the country. We are very pleased to be working with both PRAJ and The Facility Group on this project."

Lucas Rice, Xethanol's VP of Operations stated "*This site is a prime example of Xethanol's strategy of exploiting shuttered industrial capacity and converting*

52

*facilities that already have existing infrastructure to produce ethanol.* In doing so, the company is able to save significant time and money in bringing facilities on line. *This site, in particular, has millions of dollars in equipment and infrastructure in place and ready to use for ethanol production."*    [Emphasis added.]

104.    On July 21, 2006, defendants filed with the SEC a copy of the Company's Annual Proxy statement.  In the Annual Proxy defendants reiterated the same or substantially similar statements concerning the relationships of third parties to Xethanol.  In this regard, defendants reported related party transaction and extra-Company relationships that were previously reported by defendants and contained in the Company's 2005 Form 10-KSB.

105.    On July 24, 2006, defendants published a release announcing the Company's renewal of its strategic alliance with UTEK Corp.  This release, entitled "Xethanol and UTEK Announce Renewal of Their Strategic Alliance," stated, in part, the following:

> Chief Executive Officer of Xethanol, Mr. **Christopher d'Arnaud-Taylor** stated, *"I am excited about renewing this strategic alliance with UTEK that has been very productive for us since its inception. It will continue our access to prestigious research and development institutions in search of the proprietary technologies that provide us with competitive advantages in biofuels production.* We are firm believers that a strong intellectual property platform is the key to differentiating Xethanol in the marketplace."

> [Emphasis added]

106.    On August 7, 2006, the final day of the Class Period, shares of Xethanol traded to $8.00 per share, after defendants published a release announcing that the Company had entered into an agreement to purchase the Augusta, Georgia site.  According to a release published by defendants that day, Xethanol announced "that it has entered into an agreement to purchase a pharmaceutical manufacturing complex in Augusta, Georgia from Pfizer Inc., as described in prior press releases."

107.    The statements made by defendants and contained in the Company's July 6, 2006, July 20, 2006, July 24, 2006 and August 7, 2006 releases and those statements contained in the Company's Annual Proxy Report, were materially false and misleading and were know by defendants to be false at that time, or were recklessly disregarded as such, for the reasons stated herein in ¶79, *supra.*

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF XETHANOL IS BELATEDLY DISCLOSED

108.    On or about August 8, 2006, shares of Xethanol declined precipitously after investors were shocked and alarmed by the publication of a report that was highly critical of Xethanol, published by a forensic securities investigations Internet website called *ShareSleuth.com.* In fact, shares fell from a high of $8.00 on August 7, 2006, to a close of below $6.00 the following day, and in the two trading days that followed almost 2 million more Company shares traded, as Xethanol stock then fell to a low of $4.21 per share, on August 10, 2006 - - a three day decline of almost 50%.

109.    According to a report by the *Associated Press,* Xethanol shares fell after a website owned by Dallas Mavericks owner Mark Cuban reported that there was little evidence Xethanol had produced significant amounts of ethanol from biomass to claim that it could achieve commercialization, and that substantial related party associations had not been disclosed - - including the fact that many of the Company's early investors had been disciplined by regulatory agencies and that defendant Taylor had fabricated his work experience and qualifications. The *Associated Press* report stated, in part, the following:

> The 6,000-word story about Xethanol Corp. was the first published by the Cuban-backed stock fraud-investigating Web site *Sharesleuth.com.* It was written by former St. Louis Post-Dispatch reporter Christopher Carey.

Xethanol has said it can convert wood chips, corn stalks and paper sludge into ethanol, an additive designed to make gasoline cleaner-burning.

***Sharesleuth.com reported it found no evidence that Xethanol had produced significant amounts of ethanol from those materials. It also said the company's recent Securities and Exchange Commission filings listed eight shareholders who have been disciplined by the SEC or other regulatory agencie**s*.

\*   \*   \*

Sharesleuth.com delayed its Xethanol story for about a week while it was being fact-checked, Carey said. He said the fact-checking process "takes ammunition away from anyone who says we're publishing false and misleading material so that Mark Cuban can turn a profit on his investments." [Emphasis added.]

110.   The *ShareSleuth.com* report contained several specific charges of fraud, misrepresentations and material omissions by those Company officers and directors named as defendants herein.  These allegations ranged from : (i)  defendant Taylor lying on his resume and fabricating significant, relevant, material work and management experience at major U.S. corporations that he did not possess; (ii) defendants' misrepresenting the true state of the Company's Hopkinton, Iowa plant, that was not being refurbished but, rather, that lay abandoned and neglected with no current water or sewer service; (iii) defendants' omitting to disclose a host of related party transactions, as well as associations with several early stage investors that had alarming records of stock fraud, market manipulation, breach of fiduciary duty and shareholder abuse; and (iv) defendants' failure to disclose that they had no reasonable basis to claim that Xethanol could commence local biomass to ethanol production and commercialization in the near-term.

111.   First, the *ShareSleuth.com* report uncovered the fact that defendant Taylor, who had claimed to have gained "global senior corporate executive experience with multinationals" including renowned corporations such as Reed Elsevier and Northrop Grumman, had never

worked at either of these corporations.  According to *ShareSleuth.com,* upon investigation, both Reed Elsevier and Northrop Grumman could find no information confirming Taylor's employment, in any capacity.

112.   The *ShareSleuth.com* report raised the following specific issues related to the fabrication of defendant Taylor's resume.  In this regard, the *ShareSleuth.com* report stated, in part, the following:

**RESUME QUESTIONS**

*D'Arnaud-Taylor's biography says he worked as an executive for several large corporations.  Sharesleuth searched old newspaper and magazine articles, Who's Who guides and other archived material and was unable to find any references to him serving in those positions.*

*An article in Inc. magazine in 1983* identified him as president of Boles & Co., a trading company in San Francisco. It made *no mention of previous executive positions at Unilever, Reed Elsevier or Northrop Grumman. Nor did his marriage announcement in the New York Times that same year.*

*Sharesleuth has accounted for d'Arnaud-Taylor's career moves since then, and none took him to any of those companies.* So, for the claims in Xethanol's SEC filings *to be true, d'Arnaud-Taylor's would have needed to make his way through the executive ranks of all of those companies by age 37.*

*Reed Elsevier said its pension and payroll records turned up no trace of d'Arnaud-Taylor or Christopher Taylor, as he sometimes called himself. Northrop Grumman said its human-resources department was unable to verify that d'Arnaud-Taylor had worked for the defense contractor or any of the "heritage" companies it acquired through mergers and acquisitions*. Northrop Grumman noted, however, that it could not say with absolute certainty that d'Arnaud-Taylor never worked for the company.

Xethanol declined to provide d'Arnaud-Taylor's titles or dates of service at the firms.

*The first mention of d'Arnaud-Taylor's purported positions with those companies appears in a 1996 SEC filing for Continental Orinoco Co., a penny-stock company that was pursuing a minerals venture in Venezuala*. D'arnaud-Taylor was the firm's chairman and investor relations contact.

56

*SEC filings show that in July 1996, Continental Orinoco hired a onetime broker named Cary Cimino as a management consultant*. D'Arnaud-Taylor signed the agreement, which called for Cimino to receive 1 million shares of Continental Orinoco stock to advise the company on everything from management and marketing to strategic planning, international activities and shareholder relations.

*Less than three months later, Cimino was one of 45 people arrested as part of a nationwide sting aimed at cracking down on bribes to stockbrokers*. The FBI, which set up a mock brokerage firm as a front for its investigation, alleged that Cimino offered payoffs to its brokers as an inducement to sell 45,000 shares of Continental Orinoco's stock….*He was arrested in an even bigger crackdown in 2000, and was charged with offenses that included bribing brokers and soliciting the murder of a person he thought was cooperating with authorities. He pleaded guilty and was sentenced to 10 years in prison*.

[Emphasis added.]

113.    The *ShareSleuth.com* report also revealed that - - contrary to the statements made by defendants - - the Company's Hopkinton, Iowa plant was *not* being refurbished, it had been all but abandoned and it was thoroughly neglected.  In this regard, this report stated, in part, the following:

**TESTING?**

Exterior of Hopkinton plant. June 30, 2006.

Many of Xethanol's recent press releases say that the company's biotechnology is "currently deployed" at its two Iowa facilities. *The company has characterized its plant in Hopkinton, Iowa as a testbed for evaluating potential feedstocks and technologies*.

But that statement directly contradicts the company's SEC filings, which note that the plant in Hopkinton suspended production in April 2005. *When we paid a visit to the operation June 30, we found the doors locked, the building dark and no employees present. A large filtration unit sat on a grassy patch outside the plant, and an air system serving the building was in obvious disrepair*.

D'arnaud-Taylor said in an interview with The Wall Street Transcript in March that the Hopkinton plant was being refurbished "as we speak.'' But *we saw no signs of improvements, and Xethanol's SEC filings show that capital expenditures in the first quarter were just $38,000.*

*Last week, a Hopkinton city official said plans to make the plant a test facility apparently had fallen by the wayside, adding that no public utility services were being provided to the building and no Xethanol employees worked there on a regular basis.* [Emphasis added.]

114.   In addition to reporting that the Company's Hopkinton, Iowa plant was *not* being refurbished, the *ShareSleuth.com* report stated that the reason this plant was not being refurbished was because *Xethanol did not possess the technology necessary to convert biomass to ethanol in a commercially viable manner*. This report also stated that there did not appear to be a rational basis behind the Company's claim, on July 20, 2006, that the Company could foreseeably open a 50 million-gallon per year biomass ethanol project in Georgia by mid-2007, or defendant Taylor's claim that Xethanol would produce 300 to 400 million gallons of cellulosic ethanol a year by the spring of 2009.

115.   In addition to quoting leading experts who compared the commercial viability of converting biomass to ethanol as the equivalent of flying to the planet Mars, the report highlighted the fact that Iogen Corp., the operator of the only large-scale cellulose to ethanol production plant in North America, had budgeted at least $300 million and had projected that its first 50-million gallon facility could not be completed until at least a year beyond defendants' estimate for Xethanol. The *ShareSleuth.com* report compared Iogen's large investment at one plant to the grand total of $133,420 and $106,231, Xethanol had spent in 2005 and 2004, respectively, on its biomass ethanol commercialization technologies.

116.   In addition to the foregoing, the *ShareSleuth.com* report also highlighted a series of defendants' omissions relating to their failure to disclose a web of unsettling related party transactions and undisclosed interests and entanglements, and the fact that the Company had associated with a group of early investors that had been seriously censured or sanctioned by regulatory agencies. In this regard, the report stated, in part, the following:

58

*At Xethanol, we discovered that the shareholders whose names appeared in the company's SEC filings over the past year and a half included no fewer than eight current or former stock brokers who have been the subjects of disciplinary actions by the Securities and Exchange Commission, the National Association of Securities Dealers or other regulatory bodies.*

One of the five biggest shareholders in Xethanol when it went public last year was **William Scott Smith**, who *was charged by the SEC in 1995 with defrauding investors in a Denver-based shell company called Melbourne Capital Corp*. The SEC said that Smith installed his nephew and two friends as officers and directors of Melbourne Capital, and that the group -- at Smith's direction -- misused or misappropriated 70 percent of the $246,000 that the company raised from investors. The onetime stockbroker settled the charges in 1996, without admitting or denying guilt. The SEC assessed $256,000 in financial penalties and barred Smith from serving as an officer or director of any public company.

*Xethanol's SEC filings refer to him as W. Scott Smith and do not mention his past.* We confirmed that he was the same person by comparing address records, birthdates, Social Security numbers and other identifying information.

[Emphasis added.]

117.    The report also exposed other theretofore undisclosed relationships between Company insiders, including defendant Taylor, and related third parties, or third parties with very questionable pasts, in part, as follows:

**A SHARED HISTORY**

**Smith's ownership stake in Xethanol was not happenstance.**

*Florida corporation filings list D'Arnaud-Taylor and Smith as officers of London Manhattan Limited Inc., the company that provided executive-management services to Xethanol from September 2001 to January 2005.* The filings list d'Arnaud-Taylor as president of London Manhattan They list Smith as vice president and Franz A. Skryanz, another Xethanol officer, as secretary and treasurer.

*Sharesleuth uncovered a second connection between d'Arnaud-Taylor and Smith dating back to 1996. Their names appeared together in a suit filed by a New York doctor who claimed he was defrauded of $30,000*. The doctor alleged that d'Arnaud-Taylor and Smith participated in a scheme to extract an up-front fee for business financing that was promised but never materialized. The doctor dropped his suit in favor of settlement negotiations. But *d'Arnaud-Taylor's three*

*co-defendants later wound up in prison -- two for advance-fee loan frauds and one for laundering money for a drug ring.*

*Sharesleuth found that d'Arnaud-Taylor was more recently a partner in two business ventures with Andrew Kimmins, a former British brokerage executive who served prison time for fraud in the 1990s.* One of those companies, or its shareholders, had an early stake in Xethanol.

118.   In addition to the foregoing, the *ShareSleuth.com* report referred to defendant

Taylor as an "International Man of Mystery" and reported, in part, the following:

## INTERNATIONAL MAN OF MYSTERY

D'arnaud-Taylor's biography describes him as an international merchant banker, entrepreneur and turnaround specialist who has managed the strategy, operations and financial affairs of companies on four continents.

But a string of lawsuits stretching from Washington, D.C. to New York and Phoenix paint a somewhat different picture of Xethanol's 60-year-old CEO, whose father was a British diplomat.

In 1992, two of d'Arnaud-Taylor's partners in a financial-services firm called London Manhattan Co. sued him in federal court in Washington. The partners claimed that he and another member of the firm, James V. Hackney, were soliciting money for a private investment fund without their knowledge. The suit also said d'Arnaud-Taylor and Hackney engaged in other activities that were beyond the scope of London Manhattan's business. The court file included complaint letters from companies that said they paid d'Arnaud-Taylor a retainer to secure capital but had not received funding nor collected a refund.

The partners in London Manhattan settled their litigation and parted ways. The two who sued kept the company's original name, while d'Arnaud-Taylor and Hackney operated under several variations, including London Manhattan Ltd. and London Manhattan Communications.

The original London Manhattan Co., now based in South Carolina, has no connection to Xethanol or d'Arnaud-Taylor.

*Hackney was indicted on four counts of mail fraud in 1998.* Authorities said he solicited investment capital from friends and relatives, including his father-in-law, but used the money for his personal use. He was convicted and sentenced to 41 months in prison. *Hackney committed his crimes in late 1995 and early 1996, a time when he was still a partner in London Manhattan Communications*, according to descriptions of the firm contained in a pair of SEC filings from that period.

The New York doctor who sued d'Arnaud-Taylor and three other men alleged that, in late 1996,  d'Arnaud-Taylor posed as someone who was interested in backing him in a medical-management business. The doctor claimed that the people who were supposed to be arranging the financing -- Bruce W. Kitchen and Brian Cook – held out d'Arnaud Taylor and another man, Franco Nocito, as verified sources of funding simply to beat a deadline that would have triggered a refund of the doctor's $30,000 retainer. The suit said that William Scott Smith attended the same meeting and misrepresented himself as a willing source of money.

At the time, Kitchen was already facing charges in Florida in connection with an advance-free loan scheme, and was on probation in New York for running a fraudulent car-leasing operation. Nocito had been caught delivering drug cash in 1992 and agreed to cooperate with authorities. He was indicted on under seal on money-laundering charges in 1994, and was arrested and arraigned in August 1996. Smith had just settled his case with the SEC.

Kitchen eventually struck a plea bargain in the Florida case. He also pleaded guilty in a federal fraud case in New York in 2000. Those charges grew out of his activities at the financial-services company that was the focus of the doctor's suit. **Kitchen was sentenced to 50 months in prison and was ordered to pay $4.27 million in restitution. Cook also pleaded guilty in the New York case. He was sentenced to 18 months in prison and was ordered to pay $2.18 million in restitution.**

**Nocito pleaded guilty in his money-laundering case, acknowledging in his plea agreement that he had delivered $4.6 million in drug cash**.

[Emphasis added.]

119.    While defendants had previously stated that "none of Xethanol's management were involved with Zen or its business and none of Zen's management or owners are involved with Xethanol," this also appear to have been false.  According to the *ShareSleuth.com* report:

**SEC filings, however, show that Zen's treasurer and chief financial officer, Walter C. Nathan, wound up with 383,333 Xethanol shares immediately after the reverse merger.**

**Another group of Zen shareholders, headed by Lawrence M. Underwood, emerged with 138,974 Xethanol shares.**

**Nathan** was described in Zen's SEC filings as a Denver insurance salesman and former real estate developer.  Sharesleuth has looked deeper into his past and

identified him as *an ex-stockbroker, who was charged by the NASD in 1987 after two of his clients said they were guaranteed against loss as an inducement to invest $100,000 in two penny stocks*. When the value of the shares fell and the men asked for the return of their money, they were rebuffed. The NASD fined Nathan $5,000 and suspended from association with any member firm for 60 days.

*Underwood, too, is a former Denver stockbroker. He was charged by the NASD in 1986 with violating the rules of fair practice by charging excessive markups*. He was censured, fined and ordered to disgorge $10,000; however, the SEC set aside the order after Underwood appealed.

[Emphasis added.]

120.     While defendant Taylor had repeatedly defended the reverse merger by which Xethanol became a public company as legitimate and stated that this form was not adopted as a means of avoiding significant disclosure obligations inherent in an initial registration application, the *ShareSleuth.com* report disclosed other early Xethanol shareholders that each had histories of past regulatory action against them, including:

**Stanley C. Brooks**, chairman of Brookstreet Securities Corp. in Irvine, Calif. Brooks *has a long history of fines and disciplinary actions by the NASD and state regulators.*

In January, he settled compliance-related charges the NASD brought against him and an affiliated brokerage, First Securities USA Inc. Brooks did not admit or deny guilt, but agreed to a two-year ban on serving in any supervisory capacity with any member firm.

Xethanol filed a registration statement with the SEC last year listing Brookstreet with 100,000 shares. The filing said Brooks had voting and disposition power over the shares. Brooks' personal website says he and his wife are the sole owners of Brookstreet.

**Russell W. Newton**, chief financial officer of Source Capital Group Inc. in Westport, Conn.

*The NASD imposed a $180,000 fine against Newton and a previous firm, Merit Capital Associates Inc., in 1999 for using brokers known to have been barred from the industry*. The industry group also suspended Newton for 30 days and ordered him to retake a qualifying exam.

***Newton was Merit's chairman***. A joint investigation by the NASD and the State of Connecticut found that Newton, on behalf of Merit, paid $167,500 to people who were disqualified from working as registered brokers. ***The investigation also found that Merit representatives in one branch office used sales scripts that were materially misleading and made exaggerated and unwarranted claims.***

***The Utah Division of Securities brought additional charges against Newton and Merit Capital in 2001, alleging the sale of unregistered securities, sales by unlicensed agents, failure to supervise and securities fraud***. Newton settled the charges without admitting or denying guilt. He and Merit were assessed a joint fine of $25,000.

According to Xethanol's SEC filings after the reverse merger, Newton owned 94,639 shares and had options on an additional 12,187 shares.

**Marc K. Swickle** and **Howard B. Berger**, co-founders of **Professional Traders Fund LLC.**

***The Washington Division of Securities filed a complaint in February against Swickle, Berger and Professional Traders Fund, alleging that they sold unregistered securities to residents of that state***. The agency said it intended to issue a cease and desist order against the men and the firm. Swickle and Berger have asked for a hearing, so the order remains pending.

***Berger settled NASD charges in 2000 related to the alleged "flipping" of shares*** in the initial public offering of a penny-stock company.

The complaint charged that he and at least one other person at his brokerage placed more than 15 percent of the IPO shares with clients, with the understanding that the firm would buy them back immediately after the offering. The NASD also charged that Berger failed to take steps to prevent unregistered individuals from selling securities for his firm, or failed to register them.

***Berger agreed to pay a $20,000 fine. He was suspended from working in a supervisory capacity for any NASD member firm for two years and suspended from working in any capacity for 120 days.***

According to Xethanol's SEC filings after the reverse merger, Professional Traders Fund held 46,153 shares.

Xethanol declined to say how it raised money from investors when it was a private company, or whether a particular company or individual acted as placement agent for the shares.

\*   \*   \*

Nor would the company say how William Scott Smith, who is 76, wound up as one of Xethanol's largest shareholders.

\*   \*   \*

It was impossible to tell from Xethanol's filings which early shareholders invested in the company before it went public, and which bought shares in a private placement that accompanied the reverse merger.

Smith reported owning 972,414 shares of Xethanol in an SEC filing in February 2005. At the time, that stake amounted to 7.3 percent of the company. Those shares would be worth $6.76 million at Friday's closing price.

Smith's holdings excluded 338,115 additional shares held in the name of Therese Roos, with whom he has shared addresses in Delray Beach, Fla., and Westhampton, N.Y.

***One of Smith's co-defendants in the old SEC fraud case also appeared on the list of early Xethanol shareholders. A registration statement in October 2005 shows Anthony Skulski holding 2,648 shares. An additional 1,766 shares were held in the names of Skulski's two young children.*** Like Smith, Skulski settled the SEC charges without admitting or denying guilt. He agreed to pay $4,402 and commit no future violations of securities laws.

[Emphasis added.]

121.    The *ShareSleuth.com* report also exposed a related party connection between defendant Taylor and the principles of H2Diesel Inc. that also led investors to then question the true value of that previously announced contract.  According to this report:

**SMALL WORLD**

SEC filings, corporate records and other documents reviewed by Sharesleuth show that d'Arnaud-Taylor has a pattern of doing business deals with a familiar circle of associates.

D'Arnaud-Taylor's biography says he was president of Findex.com, a developer of religious software, when it went public through a reverse merger in 2000. The person who took over as that company's chairman after the deal was **Benjamin Marcovitch.**

In August 2003, Xethanol signed a partnership agreement with DDS Technologies USA Inc., a small, publicly traded company in Boca Raton, Fla. The joint-venture deal called for Xethanol's plant in Hopkinton, Iowa, to install DDS Technologies' "revolutionary'' equipment for separating agricultural products and biomass into substances that can be converted into ethanol and other byproducts.

SEC filings for DDS show that the company's chairman and chief executive at the time of the deal was none other than Benjamin Marcovitch. The filings also identify another of the company's co-founders as Lee S. Rosen, a former stock

broker whose license was suspended by the NASD from October 1998 to April 2001 because of his failure to pay an arbitration award to a former employer.

***Xethanol and DDS said in a press release that they expected to process 40 tons of biomass a day at the Hopkinton plant, starting in early 2004, and that the sale of end products would generate $5 million in annual operating profits. By October 2004, the deal between Xethanol and DDS had devolved into a federal lawsuit***, with DDS claiming in its filings that Xethanol refused to pay for the first of four units and refused to give it back. Xethanol claimed the equipment did not work as advertised.

The two companies announced last fall that they had settled their differences. DDS got its system back, while Xethanol agreed to buy a new and improved version for its Blairstown plant. The companies also agreed that Xethanol would be the exclusive marketer of the equipment to the U.S. ethanol industry.

***Xethanol said the original units did not perform as well as expected because of calibration issues***. The company added that it entered into a new deal with DDS because it thought the improved version would give it a competitive advantage, and because it wanted to preclude rivals from getting the systems.

**HELLO AGAIN**

***In April, Xethanol entered into a partnership with H2Diesel Inc., a new company headed by Rosen.***

***H2Diesel had been incorporated seven weeks earlier***. It says it has the North American, Latin American, Caribbean and African license for a proprietary additive used in making biodiesel fuel. In a convoluted deal, two investment funds with stakes in Xethanol bought 3.25 million shares of H2Diesel's stock for $2 million. H2Diesel issued an additional 2.6 million shares to Xethanol, which in turn agreed to manage H2Diesel's business.

The deal gave the investment funds, Crestview Capital Master LLC and Toibb Investment LLC, the right to sell their H2Diesel shares to Xethanol in exchange for 500,000 shares of Xethanol stock. ***They exercised that right in April, shortly after the agreement was signed. In the end, the investment funds put in $2 million and got Xethanol stock that Xethanol valued at $5.4 million. Those shares were still worth $3.47 million at the end of last week***. Xethanol said in a recent SEC filing that the additional shares it received in the swap brought its ownership stake in H2Diesel to 45 percent. [Emphasis added.]

122.   Similarly, the *ShareSleuth.com* report also uncovered relationships between

certain Company insiders, including defendant Taylor, and third parties that were purporting to

be doing business or entering into new contracts with Xethanol.   In this regard, the report

focused on defendants' recent announcement of its expansion and Phase II development and

stated, in part, the following:

### NEW PARTNERS

***Xethanol has a joint venture agreement with Coastal Energy Development Inc.,
a newly formed company in Savannah, Ga., to develop its ethanol plant in
Augusta***, as well as additional plants. The agreement calls for Coastal to locate
sites and secure funding for the plants.

Coastal Energy's president is ***Chandler Hadlock, a 30-year-old West Point
graduate who has spent most of his adult life in the military***. According to a
story that appeared in January in the Atlanta Business Chronicle, Coastal Energy
and Xethanol are getting help in the funding search from Epiphany Partners Inc.,
described as a Savannah-based merchant bank.

***Florida corporation records show that two of the founders of Epiphany
Partners were previously involved in a separate venture with d'Arnaud-Taylor
and Kimmins, the former British brokerage boss. The records, for a company
called Trafalgar Resources Inc., listed Taylor as chairman and Kimmins as
chief operating officer.***

***Delware franchise tax records also link d'Arnaud-Taylor and Kimmins at a
company called Xeminex Inc. Kimmins was listed as Xeminex's president in a
filing on Feb. 25, 2005, just a few weeks after Xethanol completed its reverse
merger. Although he did not claim them at that time, d'Arnaud-Taylor later
reported beneficial ownership of 426,588 Xethanol shares held by Xeminex***. He
said in an SEC filing that the shares were contributed through a settlement among
the shareholders of Xeminex.

***One of the founders of Epiphany Partners, John J. Murphy Jr., appears in the
Florida corporation filings for London Manhattan Limited Inc., the company
that provided management services to Xethanol. A document in April 2002 lists
him as a director of the company, with William Scott Smith as president***.
[Emphasis added.]

123.   In response to this all-out assault on the Company, on August 10, 2006,

defendants prepared and published a release headlined, "Xethanol Responds to *ShareSleuth.com*

Posting."  The Company's anemic and evasive response did little to rebut the allegations raised

by the *ShareSleuth.com* report or to assuage investors' concerns.  The Company did little more

than comment that the Sharesluth report included "misinformation and disinformation …so

egregious that we felt no alternative but to respond."  The press release went on to simply state once again that the expansion of the Blairstown site was "proceeding on schedule;" that the Company has research and development agreements with "eminent scientists;" that criticisms of the Company's "low-level of research and development expenditures are misleading;" that the board contains "independent experienced business persons" who are not referenced in the release; and that the Company "is in possession of information validating Mr. Taylor's employment history" (which it has not shared and while simultaneously refusing to confirm relevant employment dates of Mr. Taylor at the subject companies).  Defendant Taylor was quoted as stating: "it is a shame and a disservice to the investor community and our shareholders that derogatory and misleading articles such as the one issued by ShareSleuth are published.  We find such articles reprehensible.  Xethanol questions the real purpose of this article, particularly in light of Mr. Cuban's professed intention to 'short the shares of this company.'"

124.    The market was unconvinced by the Company's "rebuttal," which did little to prevent the latest negative revelations from taking a further toll.  On August 10, 2006, after declining from a high of $8.00 on August 7, 2006, to a close of $5.25 on August 9, 2006, shares fell further still - - to a low of $4.21 per share.

125.    On August 18 and 19, 2006, shares of the Company closed at below $5.00 on both days, following *TheStreet.com's* publication, on August 17, 2006, of its report titled "'***Gaping Holes' at Xethanol.***"    In addition to reiterating many of the same issues raised in the *ShareSleuth.com* report, *TheStreet.com* report also highlighted James Stewart's true experience, further shocking investors by revealing, in part, that:

Meanwhile, controversy over the stock continues to rage.

67

Fans still love Xethanol because, based on its press releases and regulatory filings, the company could soon become the first big player in the so-called biomass-to-ethanol business. But skeptics wonder.

At least one Xethanol holder, private investigator Michael Ferrari of Pleasanton, Calif., counts himself among the doubters. Ferrari says he was hired by an elderly woman who bought the stock and then grew concerned about the company. He purchased some of the stock from her and then bought put options -- which become valuable if the stock falls -- to limit his exposure.

"I'm sure you have heard the investigator credo: 'A coincidence is just a coincidence, until there are too many coincidences,'" Ferrari says. "In my 21-year career, this is the longest string of coincidences I have ever encountered or studied."

Xethanol's stock, which fetched more than $15 a share at its peak, tumbled 6.2% to $4.66 on Wednesday.

'Key Employees'

At this point, sharesleuth.com has already raised a number of troubling questions.

*Perhaps most notably, the blog found no evidence supporting Xethanol's claims that its CEO held executive positions at the big-name corporations listed in his official bio. Nor could it find any reason to believe that Xethanol will be turning waste into ethanol by next year, as it promises. After all, bigger players like the federal government are still struggling to do so, and one of Xethanol's two ethanol plants remains idled.*

TheStreet.com recently set out to learn more about Xethanol's business operations and the plant managers who supposedly run them.

Aside from named executives, Xethanol lists two "key employees" in regulatory filings. *The first is James Stewart, a corporate vice president who runs the one company plant that actually operates. Based on that filing, Stewart "has more than 23 years of experience in ethanol production in the United States and throughout the world."*

*But the Business Record, a local publication in Iowa, has painted Stewart as a regular sort of guy. The article says that Stewart, a cattle producer by trade, hatched the idea for a farmer-owned ethanol plant after viewing a government video in the mid-1990s. In the interview, Stewart told the newspaper that farmers got interested in the idea -- and pitched in $5,000 worth of corn each to invest....*

68

*The plant ran into trouble and shut down a couple of years after that story appeared. In 2004, The Gazette of Cedar Rapids reported the bank finally sold the plant at auction to Xethanol -- the only bidder -- for a bit more than its $5.3 million asking price.*

*Today, that corn-based ethanol plant serves as Xethanol's only source of operating revenue. Based on its regulatory filings, the company last year generated $4.34 million in sales -- enough to cover the $3.3 million spent on setting up a new corporate headquarters, but very little else. The company ended the year $11.4 million in the red.*

[Emphasis added.]

126.   TheStreet.com also reported on the state of the Company's Hopkinton, Iowa

plant, adding the following to the *ShareSleuth.com* report, including that:

### Idled Plants

*Xethanol's other ethanol plant -- described by sharesleuth.com as dark, empty and "in obvious disrepair" -- reportedly has no utilities, let alone a manager or staff.* So it remains unclear exactly what the company's second "key employee" does.

In its regulatory filings, Xethanol lists David Kreitzer as its vice president of business development. The company says that Kreitzer "has worked in every area of ethanol production" and highlights his role as past president of Gopher State Ethanol in particular.

As recently as May, Kreitzer seemed to still be in charge of that company. An article published by the Star-Tribune of St. Paul, Minn., specifically names Kreitzer as the property manager of Gopher State Ethanol -- a bankrupt ethanol plant that once operated inside a historic brewery. The plant shut down in 2004, the Star-Tribune reported, after nearby residents sued over its noise and smell. Those neighbors seem unhappy with the facility still.

*"Neighbors became worried when they saw gaping holes in several buildings after the owners removed pieces of equipment," the Star-Tribune reported in May. "Kreitzer said that some of the 'openings' were pre-existing, and that he isn't inclined to alter 'the historic portions of the property.'"*

[Emphasis added.]

127.   Thereafter, the financial press also reported what can only be described as

admissions by defendants, that the Company had misrepresented the background of defendant

Taylor, as well as the falsification of the number of plants that were operational in Iowa.  As evidence of this, on August 24, 2006, *TheStreet.com* reported that Bernstein had told its reporters that **"the Company has in fact verified <u>some</u> disputed claims in Taylor's resume."** (Despite ongoing concerns regarding the falsification of Taylor's resume, this was not enough to stop the Company from later offering Taylor a consulting deal valued at over $500,000).   Moreover, in a *Fortune Small Business* report dated February 2007, Robin Buller, Xethanol's vice president of strategic development, was quoted as stating that the ***<u>Company's business presentation stating that Xethanol had two plants in Iowa "was a mistake" and that the description in the presentation was "incorrect."</u>***

128.    In addition to the foregoing, the unexpected and abrupt departure of defendant Taylor from the Company announced on or about August 22, 2006, only served to strengthen investors' belief that the information contained in the *ShareSleuth.com* and *TheStreet.com* reports was true and accurate.  Moreover, despite the Board's recent announcement of support for defendant Taylor - - demonstrated by the reported signing of an extended multi-year employment contract - - the statement in the Company's release announcing the elevation of Louis Bernstein conceded that the Board had been searching for a new CEO for several months.

129.    As the dust settled on Xethanol, and as investors digested the full significance of these belated disclosures, shares of the Company traded even lower in the days and weeks that followed.  Accordingly, by September 26, 2006, shares of Xethanol traded to an inter-day low of $2.58 per share - - a decline of almost 65% from August 8, 2006, and a decline of almost 85% compared to the Class Period trading high of over $16.00 per share reached in mid-April 2006.

130.    In addition to the foregoing, in the weeks and months after the collapse of Xethanol's stock price, as defendants began reorganizing the Company, investors  continued to

learn of defendants' material misrepresentations during the Class Period - - **including that Xethanol could not produce ethanol from biomass**. In fact, almost immediately after naming three new Board members, a disagreement broke out over whether the Company would continue on its ill-fated plan to produce ethanol from biomass - - something it could then not accomplish - - or whether it would finally admit that it was only capable of producing ethanol from corn. Accordingly, Marc J. Oppeheimer, elected to the Board on October 10, 2006, sided with Bernstein in informing the Xethanol Board that unless the Company made this necessary and proper admission and began limiting Xethanol's production to corn-ethanol, at Xethanol's November 9, 2006 Board meeting they would resign from the Board.

131.    By November 10, 2006, the Company announced that Oppenheimer had resigned from the Board of Directors and that Bernstein had resigned as interim CEO, President and Director of Xethanol.[1]  At the time of their purported resignation, the release published by defendants stated that Bernstein and Oppenheimer had resigned as a result of "philosophical differences with other board members."

132.    The reality was that the "philosophical differences" actually related to the Company's false statements concerning Xethanol's ability to produce ethanol from biomass and the failure to disclose certain third party relationships. Thus, the Letter of Resignation dated November 9, 2006, and sent by Bernstein to David Ames as President and CEO of the Company stated, "*my resignation is the result of my recent discovery of what I perceive to have been the lack of full disclosure* both to certain members of a previous board, including myself, with

---

[1] At that time, defendants also announced that David R. Ames and William P. Behrens would take over as non-executive chairman and as President and CEO, respectively. Both Behrens and Ames joined the Xethanol Board on October 3, 2006. Behrens currently serves as vice-chairman of Northeast Securities Inc, the firm that acted as placement agent in connection with Xethanol's April 2006, $34 million fundraising.

respect to a certain transaction involving the Company, and to certain members of the current board, including myself, with respect to certain current relationships with the Company, and my disagreement with new management over its proposed business strategy for the Company."

133.   Similarly, and in even more forceful terms, in his Resignation Letter, Marc Oppenheimer stated that, **"the action taken by the Board today in adopting a plan of action that I deem to be unachievable and not in the interests of shareholders leads me to resign for philosophical reasons**.   As Directors, we have clear fiduciary duties, and I believe that continuing to serve on this Board, given **the direction we are taking today, will result in our violation of those obligations**."   The "plan of action" to which Oppenheimer referred, was Ames' and the remainder of the Xethanol Board's expansion of its biomass to ethanol program.

134.   A February 2007 *Fortune* report on Xethanol also provided more insight into the November 9, 2006 Board meeting that led to the immediate resignation of Bernstein and Oppenheimer - - and further demonstrated that Xethanol *never* possessed a method that would allow it to engage in the commercial production of biomass ethanol.   The *Fortune* report stated, in part, that:

> BESIEGED BY SHAREHOLDER suits and beset by allegations of fraud, Xethanol's seven-member board met on Nov. 9, 2006. By all accounts, it was a tense meeting, thanks to the presence of David Ames, 57, an Alpharetta, Ga., resident, former adman, and founder of a cable-box maker that netted him tens of millions in the late 1990s. Ames, who had joined the board only a month earlier, arrived with a proposal: Xethanol should press forward in its bid to become an experimental-ethanol maker, skeptics be damned. The company has licenses, **he argued, so just let the engineers tinker with them. Eventually Xethanol would make good on its promises. "When you put ten engineers in a room and ask them to get from A to Z, they'll get there,"** he told FSB.
>
> **A rival board faction insisted that it was time for Xethanol to settle for being a small maker of corn-brewed ethanol. Ames won**. The board endorsed his vision by electing him the company's new CEO by a vote of 4 to 3.

During the meeting one of the dissenters, Marc Oppenheimer, who was chairman of the audit committee, resigned. Interim CEO Bernstein followed later that day. Says Oppenheimer: ***"There's one tried-and-true way to make ethanol. You make it out of corn. Promising to make it out of waste? Well, you shouldn't promise what you can't deliver."***

Five days after the board meeting, Xethanol completed the acquisition of a facility in Spring Hope, N.C. The plant cost $4 million, plus 1,197,000 Xethanol shares. Xethanol's new acquisition is an old, shuttered fiberboard plant. It has been sitting idle since 1998, when International Paper closed it down, laying off 200 people.

Here's how Xethanol describes the new facility in a press release: "We plan to reopen the facility in 2007 as a pilot plant to demonstrate the technical feasibility and economic viability of using wood chips as a cellulosic feedstock."

So what exactly does that mean ? "***The first feedstock will be corn to get things up and running," explains Xethanol's Buller. When asked how that qualifies as a pilot plant for "cellulosic feedstock," an exasperated Buller finally replied, "We at least damn it! are making ethanol."***

What does the future hold? CEO Ames says the complaints from former board members Oppenheimer and Bernstein are nothing more than "sour grapes." The SEC will not comment on whether it has launched an investigation. ***Horowitz of Soleil Securities, the lone analyst covering the company, has a strong sell on the stock.***

In the meantime, Xethanol just announced that it has formed a new alliance with a company in Florida, and that it plans to start making an experimental kind of ethanol next year from orange peels. [Emphasis added.]

135.    According to a December 14, 2006 follow-up report by ShareSleuth.com, the Company's purported joint venture with Renewable Spirits, LLC of Boca Raton, Florida, to make ethanol from citrus peel biomass was also riddled with uncertainty.  According to ShareSleuth, Xethanol's new partner, Renewable Spirits LLC, was founded and financed by Raymond Scott Stevenson, former vice president of taxation at Tyco International, Ltd. According to ShareSleuth, two weeks prior to this announcement, Stevenson was sentenced to three years in prison after admitting that he deliberately failed to report $170 million of income

on Tyco's 1999 tax return. As part of his plea agreement, Stevenson agreed to pay a fine of $250,000.

136.    The representations concerning the Company's purported citrus to ethanol expansion in Florida, as well as its wood-chip to ethanol plant recently announced in North Carolina, also appear to have been misstated given that, by December 2006, Global Energy & Management, LLC had terminated its participation in NewEnglandXethanol, LLC after **the Company could not produce the technology necessary to turn biomass to ethanol**.  As evidence of this, on December 11, 2006, ShareSleuth.com also reported, in part, the following:

> Xethanol Corp.'s partner in developing ethanol projects in New England has terminated their joint venture, citing concerns about the company and its technology.

> Global Energy and Management LLC notified Xethanol (AMEX: XNL) of the decision late last week. Lee R. Tyrol, a principal of Global Energy, also resigned as manager of the partnership, called NewEnglandXethanol LLC.

> Tyrol confirmed the termination to Sharesleuth.com on Friday. He said that Global Energy had lined up suppliers of raw materials for conversion to ethanol, had located plant sites and had identified buyers for the end product.

> *In the end, Tyrol said, Xethanol was unable to deliver a production process that would enable the plants to turn organic waste into ethanol on a large-scale, commercial basis.*

> Xethanol has billed itself as a leader in the race to develop a method for making ethanol from biomass, such as wood chips or plant material, instead of conventional feedstocks like corn.

> *"They were supposed to provide us with technology, which they didn't," Tyrol said. "Obviously, there is no silver bullet.''*

> Sharesleuth published an investigative report on Aug. 7 questioning Xethanol's claims that it was poised to produce so-called cellulosic ethanol. The story noted that Xethanol had acquired nearly all of its technology from government and university labs, had spent relatively little on research and development and had offered no evidence that it was able to produce cellulosic ethanol in large batches or at prices competitive with other fuels.

The story also raised questions about the backgrounds of Christopher d'Arnaud-Taylor, Xethanol's then-chairman and chief executive, and others involved in the company.

Xethanol and Global Energy had announced their partnership in April. At the time, the partners told the Associated Press that they hoped to use waste products from breweries, pulp from paper plants, grass clippings and other materials to make ethanol.

***The agreement called for Global Energy to contribute $1.5 million to NewEnglandXethanol -- $250,000 on the signing of the organizational and operating agreements, $250,000 within 90 days of that event, and $1 million upon approval of the plan to build the first plant.***

Xethanol, which is based in New York, has two other joint ventures in the Southeast. Those entities each have acquired an idled factory that they plan to retrofit for ethanol production. One is an Augusta, Ga.; the other is in Spring Hope, N.C.

Tyrol said Global Energy initially had no qualms about getting involved with Xethanol, because several big investment firms, including Goldman Sachs and Co., had already bought millions worth of stock in the company.

***"I assumed that the folks on Wall Street had more than done their due diligence on this project," he said.***

Xethanol's shares have fallen from a high of $16.18 in April to a closing price of $2.39 on Friday. Tyrol said Global Energy, which got Xethanol warrants as part of its deal, suffered along with other Xethanol stockholders.

***"I lost money on the deal also," he said.***

[Emphasis added.]

137.    In addition to the foregoing, Bernstein's letter to the Board dated November 16, 2006, further objected to the Company's description of Xethanol's new CEO, Ames, as being independent and having no prior course of dealing with the Company.  In this regard, Bernstein's letter to the Board also stated, in part, that:

Disagreement : In view of my recent discovery of what I perceive to have been the lack of full disclosure both to certain members of a previous board, including myself, with respect to the transaction earlier this year by which Xethanol Corporation and Coastal Energy Development formed Coastal Xethanol LLC, and

to certain members of the board as it was constituted between October 1, 2006 and November 9, 2006, including myself, with respect to the current relationships between and among Xethanol Corporation, Mr. Ames and one or more principals of Coastal Energy Development, I do not understand the basis upon which Xethanol Corporation is able to make a statement and represent that "there has been no transaction during the past two years, or proposed transaction, to which Xethanol was or is to be a party in which Mr. Ames had a direct or indirect interest required to be disclosed under Item 404 of Regulation S-B".

## CAUSATION AND ECONOMIC LOSS

138.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Xethanol's stock price and operated as a fraud or deceit on Class Period purchasers of Xethanol's stock by misrepresenting the Company's true operational condition.  Over a period of approximately seven months, defendants deceived investors and improperly and artificially inflated the Company's share price. Ultimately, however, when defendants' prior misrepresentations and omissions and fraudulent conduct came to be revealed and was apparent to investors, the price of Xethanol shares declined precipitously - - evidence that the prior artificial inflation in the price of Xethanol's shares was eradicated.  As a result of their purchases of Xethanol stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

139.    By improperly mischaracterizing the Company and omitting to disclose the critical, true, adverse facts about the Company – including that the core concept of its business model could not be achieved; the serious concerns regarding the capabilities and fabricated work experience of its managers; and the inescapable trail of fraud and corruption and regulatory investigations, findings, settlements and penalties with regard to its early-stage investors -- defendants presented a materially misleading image of the Company and its near-term future growth prospects.

140.    During the Class Period, defendants repeatedly emphasized the ability of the Company to commercialize biomass ethanol in the foreseeable near-term and consistently reported deals with independent third-parties regarding viable technologies that would enable such commercialization.

141.    At all relevant times, defendants stated that defendant Taylor had the experience and skills necessary to lead Xethanol to profitability and success when in fact Taylor had neither the experience nor the skill and Xethanol was neither profitable nor successful.  These claims caused and maintained the artificial inflation in Xethanol's stock price throughout the Class Period, and until the truth about the Company was ultimately revealed to investors.

142.    Defendants' false and materially misleading statements had the intended effect of causing Xethanol's shares to trade at artificially-inflated levels throughout the Class Period.  As evidence of this, during the Class Period, Xethanol shares reached a trading high of over $15.00 per share in late-April 2006.

143.    On August 8, 2006, however, investors learned of the *ShareSleuth.com* report and realized that: (i)  defendant Taylor had fabricated his resume, inventing out of whole cloth significant, material and relevant work and management experience at major U.S. corporations that he did not in fact have; (ii) defendants misrepresented the true state of Xethanol's Hopkinton, Iowa plant.  That plant was not currently being refurbished or updated and it did not even have running water or sewer service at that time; (iii) defendants omitted to disclose a host of related party transactions, as well as associations with several early-stage investors that had alarming records of stock fraud, market manipulation, breach of fiduciary duty and shareholder abuse; and (iv) defendants had no reasonable basis to claim that Xethanol could commence local biomass to ethanol production and commercialization in the near-term.

144.    These belated disclosures had an immediate, adverse impact on the price of Xethanol shares.

145.    These belated revelations also evidenced defendants' prior falsification of Xethanol's business prospects through defendants' false statements.  As investors and the market ultimately learned, the Company's prior business prospects had been overstated and the costs necessary to commercialize biomass ethanol had been severely understated.  As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Xethanol's share price, and these investors were damaged as a result of the related share price decline.

146.    As a direct result of the publication of the *ShareSleuth.com* report on August 8, 2006, Xethanol's stock price collapsed - - falling almost 50% within the three trading days following the report's publication.  This dramatic share price decline eradicated much of the artificial inflation from Xethanol's share price, causing real economic loss to investors who purchased this stock during the Class Period.  In sum, as the truth about defendants' fraud and illegal course of conduct became known to investors, and as the artificial inflation in the price of Xethanol shares was eliminated, Lead Plaintiff and the other members of the Class were damaged, suffering an economic loss of at least several dollars per share.

147.    The decline in Xethanol's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market.  The timing and magnitude of Xethanol's stock price decline negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

148.    During the same period in which Xethanol's share price fell approximately 80% as a result of defendants fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.  The economic loss, *i.e.* damages suffered by Lead Plaintiffs and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Xethanol's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed.

149.    During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

150.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.  210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  SEC Rule 13a-13 requires issuers to file quarterly reports.

151.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

152.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the

Management Division and Analysis Section ("MD&A") must include, among other things, a

discussion of any material changes in the registrant's results of operations with respect to the

most recent fiscal year-to-date period for which an income statement is provided.  Instructions to

Item 303 require that this discussion identify any significant elements of registrant's income or

loss from continuing operations that are not necessarily representative of the registrant's ongoing

business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of

a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations. If the registrant knows of
> events that will cause a material change in the relationship between costs and
> revenues (such as known future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in relationship shall be disclosed.
> [Emphasis added.]

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of future
> financial condition. This would include descriptions and amounts of (A) matters
> that would have an impact on future operations and have not had an impact in the
> past. . . [Emphasis added.]

153.    The GAAP requirement for recognition of an adequate provision for foreseeable

costs and an associated allowance applies to interim financial statements as required by

Accounting Principles Board Opinion No. 28.  Paragraph 17 of this authoritative pronouncement

states that:

> The amounts of certain costs and expenses are frequently subjected to year-end
> adjustments even though they can be reasonably approximated at interim dates.
> To the extent possible such adjustments should be estimated and the estimated
> costs and expenses assigned to interim periods so that the interim periods bear a
> reasonable portion of the anticipated annual amount. [Emphasis added.]

154.   The Company's financial statements issued during the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP principles, among others:

(a)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)   The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)   The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)   The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)   The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)   The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)   The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

155.     In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)     defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. ' 210.4-01(a)(1).

156.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP.  The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the Company's interim and annual financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein.

## ADDITIONAL SCIENTER ALLEGATIONS

157.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Xethanol, their control over, and/or receipt and/or modification of Xethanol's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xethanol, participated in the fraudulent scheme alleged herein.

158.   Defendants were motivated to materially misrepresent to the SEC and investors the true operational condition of the Company because : (i) it allowed defendants to artificially inflate the price of Company shares; (ii) it enabled defendants to register for sale with the SEC, millions of shares of Company stock held by insiders and/or defendants and also allowed the Company to raise over $45 million through the private sale of equity, both while in possession of material adverse non-public information about Xethanol; (iii) it allowed certain insiders, including defendants Taylor and Langberg to liquidate millions of dollars of their personally-held Xethanol shares, also while in possession of material, adverse, non-public information about the Company; and (iv) caused investors to purchase or acquire shares of Xethanol stock at artificially inflated prices.

159.   Accordingly, during the Class Period, Company insiders raced to the market to liquidate significant amounts of their personally-held Xethanol shares while in possession of material adverse non-public information about the Company, as follows:

| INSIDER | DATE | SHARES | TRANSACTION | VALUE |
|---|---|---|---|---|
| Christopher D'arnaud-Taylor | 4/12/2006 | 100,000 | Sale at $12.33 per share | $1,233,000 |
| | 2/24/2006 | 4,000 | Sale at $5.32 per share | $21,280 |
| | 2/23/2006 | 6,770 | Sale at $5.33 to $5.35 per share | $36,000 |
| | 2/22/2006 | 11,230 | Sale at $5.32 to $5.47 per share | $61,000 |

| | 2/21/2006 | 3,000 | Sale at $5.30 per share | $15,900 |
|---|---|---|---|---|
| Jeffery S. Langberg | 4/12/2006 | 105,000 | Sale at $12.19 per share | $1,279,950 |
| | 2/24/2006 | 25,000 | Sale at $5.52 per share | $138,000 |
| TOTAL | | 405,000 | | $2,785,130 |

160.    In addition to the foregoing, in late-December 2005, immediately prior to the inception of the Class Period, defendants also registered for sale over 19.765 million shares of Company stock, each share of which was eligible for resale during the Class Period by certain officers, directors and parties related to the Company.  This registration also included hundreds of thousands of additional shares that were owned by entities controlled by defendants or family members related to them.  These shares, which may or may not also have been liquidated during the Class Period, include in part, the following:

| NAME | Beneficial Ownership Prior to Offering | Shares Registered in Offering | Beneficial Ownership Following Offering |
|---|---|---|---|
| **Lawrence S. Bellone** | 916,680 | 566,681 | 350,000 |
| **Bresner Partners Ltd.** (Langberg) | 1,103,512 | 1,103,512 | 0 |
| **Brookstreet Securities Corp.** (Brooks) | 100,000 | 100,000 | 0 |
| **Susan Danehower** (Taylor) | 1,641,610 | 757,450 | 884,160 |
| **Richard Ditoro** | 48,828 | 8,282 | 40,000 |
| **Jeffrey S. Langberg** | 1,162,595 | 100 | 1,162,495 |
| **Kelly Langberg** | 1,162,595 | 58,983 | 1,103,612 |
| **Robert & Carol Lehman** | 882,810 | 882, 810 | 0 |

| | | | |
|---|---|---|---|
| **London Manhattan Limited Inc** | 12,539 | 12,539 | 0 |
| **London Manhattan Securities Inc.** | 318,088 | 318,088 | 0 |
| **Ben Marcovitch** (H2Deisel) | 135,000 | 135,000 | 0 |
| **Professional Traders Fund LLC** | 46,153 | 46,153 | 0 |
| **Jed Schutz** | 844,510 | 417,349 | 144,663 |
| **Franz A. Skryanz** | 86,515 | 86,515 | 0 |
| **Anthony Skulski** | 2,648 | 2,648 | 0 |
| **Jacob Skulski** | 883 | 883 | 0 |
| **Lillian Skulski** | 883 | 883 | 0 |
| **W. Scott Smith** | 972,414 | 919,446 | 52,968 |
| **Christopher d'Arnaud-Taylor** | 1,641,610 | 7,062 | 1,634,548 |
| **Michael Underwood** | 25,000 | 25,000 | 0 |
| **Underwood Family Partners, Ltd.** | 113,974 | 113.974 | 0 |
| **Xeminex Inc.** (Taylor) | 426,588 | 426,588 | 0 |
| **Xtraction Technologies LLC** (Taylor) | 132,422 | 132,422 | 0 |
| | | | |

## CLASS ACTION ALLEGATIONS

161.     Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Xethanol between January 31, 2006, and August 8, 2006, inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are

defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Xethanol common shares were actively and efficiently traded on the AMEX or Over the Counter.  As of March 24, 2006, the Company had over 16.167 million shares of common stock issued and outstanding.

163.    While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Xethanol or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

164.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

165.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

166.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Xethanol; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

167.    A class action is superior to all other available methods for the fair and  efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### Applicability Of Presumption Of Reliance: <br> Fraud-On-The-Market Doctrine

168.    At all relevant times, the market for Xethanol's common stock was an efficient market for the following reasons, among others:

(a)     Xethanol's stock met the requirements for listing, and was listed and actively traded on the AMEX national market exchange, a highly-efficient and automated market; prior to its listing on the AMEX, Xethanol was actively traded in the Over the Counter market, a highly-efficient and automated market;

(b)     As a regulated issuer, Xethanol filed periodic public reports with the SEC and the AMEX;

(c)     Xethanol regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)   The average daily trading volume of Xethanol shares was approximately 495,000 during the Class Period.   Approximately 64 million shares traded during the Class Period;

(e)   Goldman Sachs was a market maker with a strong interest in Xethanol securities and there were numerous additional market makers in the stock;

(f)  The Company filed SB-2 Registration Statements, which is a near-equivalent to an S3 Registration Statement, permitted only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary;

(g)  Xethanol was followed by securities analyst Soleil Securities who wrote reports which were distributed to the sales force and certain customers of the brokerage firm. Each of these reports was publicly available and entered the public marketplace;

(h)  Xethanol was closely and regularly followed by investors on the internet, including, *inter alia*, through active internet blog sites relating to the Company, including one prepared by Sharesleuth.com, and through Yahoo finance message boards and the like;

(i)  the Company further exposed itself to the investor community via webcasts and podcasting as well as an "Investor Portal" designed to "communicate Xethanol's vision" to a broader audience through an alliance with Xangani, a stock promotion company;

(j)  the price of Xethanol shares reacted quickly to unexpected news events, including the Company's positive press releases as well as negative news reported on the Internet and/or in the print media about the Company.   The price of Xethanol shares rose and fell in response to positive and negative news during the Class Period;

169.    As a result of the foregoing, the market for Xethanol securities promptly digested current information regarding Xethanol from all publicly-available sources and reflected such information in Xethanol stock price. Under these circumstances, all purchasers of Xethanol common stock during the Class Period suffered similar injury through their purchase of Xethanol common stock at artificially-inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

170.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Xethanol who knew that those statements were false when made.

## ADDITIONAL ALLEGATIONS REGARDING THE INDIVIDUAL DEFENDANTS

171.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and

forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

172.    The false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly-defined group of Individual Defendants.  Each of the above officers of Xethanol, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

173.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the American Stock Exchange (the "AMEX"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded

common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

174.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Xethanol, each of the Individual Defendants had access to the adverse undisclosed information about Xethanol's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Xethanol and its business issued or adopted by the Company, materially false and misleading.

175.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

176.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Xethanol common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme enabled defendants to: (i) artificially inflate the price of Company shares; (ii) register for sale with the SEC millions of shares of Company stock held by insiders and/or defendants and also allowed the Company to raise over $45 million in private equity while in possession of material adverse non-public information about the Company; (iii) allow certain insiders, including defendants Taylor and Langberg, to liquidate millions of dollars of their personally-held Xethanol shares also while in possession of material adverse non-public information about the Company; and (iv) caused investors  to purchase or acquire shares of Xethanol at artificially-inflated prices.

## BASIS OF ALLEGATIONS

177.    Lead Plaintiffs have alleged the following based upon the investigation of Lead Counsel, which included a review of SEC filings by Xethanol, as well as regulatory filings and reports, securities analyst's reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, information available about the Company on the Internet, and discussions with former Xethanol employees and other persons with knowledge about the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

**Violation Of Section 10(b) Of**
**The Exchange Act And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

178.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

179.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) artificially inflate the price of Company shares; (ii) enable defendants to register for sale with the SEC millions of shares of Company stock held by insiders and/or defendants and also allow defendants to raise over $45 million through the private sale of equity, each while in possession of material adverse non-public information about Xethanol; (iii) enable certain insiders, including defendants Taylor and Langberg, to liquidate millions of dollars of their personally held Xethanol shares, also while in possession of material adverse non public information about the Company; and (iv) cause investors to purchase or acquire shares of Xethanol stock at artificially-inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

180.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Xethanol's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

181.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

182.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Xethanol as specified herein.

183.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Xethanol's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Xethanol and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Xethanol common stock during the Class Period.

184.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

185.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Xethanol's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

186.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Xethanol common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Xethanol's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Xethanol common stock during the Class Period at artificially-high prices and were damaged thereby.

187.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead

Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Xethanol was experiencing, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Xethanol common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

188.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

189.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of
The Exchange Act Against Individual Defendants**

190.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

191.    The Individual Defendants acted as controlling persons of Xethanol within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

192.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

193.     As set forth above, Xethanol and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney fees and expert/consultant fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.


Dated:  March 23, 2007

**KAHN GAUTHIER SWICK, LLC**

/s/ Kim E. Miller

Michael A. Swick  (MS-9970)
Kim E. Miller (KM-6996)
12 E. 41st Street
12th Floor
New York, New York  10017
Telephone: (917) 439-5952
Facsimile:  (504) 455-1498

**KAHN GAUTHIER SWICK, LLC**
Lewis S. Kahn
Glen Woods
650 Poydras Street - Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Lead Counsel for Lead Plaintiffs and the Class**

## CERTIFICATE OF SERVICE

I hereby certify that this AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS was filed though the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

_/s/Kim E. Miller_____

Kim E. Miller