## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE XETHANOL CORPORATION SECURITIES LITIGATION | CIVIL ACTION NO. 06-10234(HB) |

## DECLARATION OF KIM E. MILLER IN SUPPORT OF (1) APPROVAL OF PROPOSED SETTLEMENT AND (2) AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

I, **KIM E. MILLER**, declare:

1.     I, Kim E. Miller, am a partner at the law firm of Kahn Gauthier Swick, LLC ("KGS"). I am admitted to practice law in the States of New York and California and I am admitted to the Southern District of New York.

2.     KGS is Lead Counsel for Lead Plaintiff the Counsell Group ("Plaintiff") in the above-captioned action (the "Litigation"). I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this Litigation.

3.     I submit this declaration in support of (a) Plaintiff's motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of the proposed settlement of this Litigation and (b) Plaintiff's petition for an award of attorneys' fees and reimbursement of expenses. The Stipulation of Settlement dated as of April 29, 2008 (the "Stipulation"), provides for payment of

$2.8 million in cash, which has been deposited in escrow and is earning interest for the benefit of the Class (the "Gross Settlement Fund"). This settlement (the "Settlement") resolves all claims asserted by Plaintiff and the Class in this action against Defendants Xethanol Corporation. ("Xethanol" or the "Company"), Christopher D'Arnaud-Taylor, Jeffery S. Langberg, and Lawrence S. Bellone (collectively, "Defendants").

4.      This declaration sets forth the nature of the claims asserted; the history of the litigation from its inception, through the motion to dismiss phase, discovery, settlement negotiations and mediation, and culminating in the settlement approval process. The Declaration addresses the reasons the proposed Settlement and the Plan of Allocation are fair, reasonable, and adequate, and in the best interests of the Class, and why the petition for attorneys' fees and expenses is reasonable and should be approved by the Court.

**PRELIMINARY STATEMENT**

5.      This case was vigorously litigated from its inception. On October 23, 2006, Lead Counsel KGS filed the first Complaint in this Action on behalf of plaintiff Milton Arial. On March 14, 2007, the Court appointed the Counsell Group as Lead Plaintiff pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and approved their selection of KGS as Lead Counsel in the previously-consolidated action *In re Xethanol Corporation Securities Litigation*. Lead Counsel thoroughly reviewed and analyzed all publicly-available information regarding Xethanol, conducted an in-depth investigation with the assistance of highly-experienced outside investigators, located and interviewed a number of former Xethanol employees and other third party witnesses with information bearing directly on Plaintiff's claims, and prepared a detailed amended consolidated complaint (the "Complaint"). Prior to the filing of

Defendants' motion to dismiss, at Defendants' request, the parties had an in-person early settlement negotiation meeting at Plaintiff's counsel's New York offices. At that meeting, the parties were unable to reach an agreement and the litigation continued. Plaintiff vigorously defended the Complaint and defeated Defendants' motion to dismiss Thereafter, formal discovery commenced under a rigorous timeline. The discovery included extensive meet and confer, the production and review of thousands of pages of documents, and preparation for and scheduling of depositions of all of the members of the Counsell Group in New Orleans and preparation for and scheduling of depositions of several current and former employees of the Company. Lead Counsel also interviewed several industry experts and had reached an agreement to retain two ethanol consultants who would assist Lead Counsel in its scheduled site visits to three Xethanol plants, scheduled for early December 2008, at which Lead Counsel arranged to videotape its inspections of each facility and take samples for expert analysis.

6.      Lead Counsel conducted an analysis of damages, consulting a damages expert regarding estimates of the number of class members, shares damaged, and total damages to the class. This included an analysis of Class recovery. The $2,800,000 settlement, seen in light of the estimated $14,500,000 in damages, represents a 19.3% recovery for the Class. Lead Counsel also engaged in ongoing communications with all members of the Court-appointed Lead Plaintiff throughout the course of the litigation.

7.      On November 28, 2007, Lead Counsel, Counsel for Defendants, and Xethanol's current CEO David Ames and current COO Thomas Endres met in West Palm Beach, Florida to mediate the case before a retired Federal Judge, the Honorable Nicholas Politan. In the course of a full day mediation session, the parties reached a resolution and agreed in principle to settle the Litigation. During settlement negotiations, Lead Counsel made it very clear that, while they were

cognizant of the strengths and weaknesses of their case, they would continue to litigate rather than settle for less than fair value. Lead Counsel refused several settlement offers and persisted until they achieved an amount they and Lead Plaintiff thought to be in the best interest of the Class in light of the surrounding circumstances. Despite diametrically opposed views on the merits, the parties arrived at a settlement after extensive negotiation between counsel for the parties. Key to these negotiations was the Company's ability to pay, and as noted in the Declaration of mediator Nicholas Politan, "Xethanol's ability to contribute cash to the settlement beyond the amount of insurance proceeds was vigorously contested." The estimated damages in this Action are approximately $14,500,000, and the final agreed amount of the Settlement represents a 19.3% recovery for the Class. Given the Company's limited insurance coverage and minimal ability to contribute cash to the settlement, the Company's precarious financial condition on the brink of bankruptcy, and continued litigation was unlikely to result in a higher settlement but would rather exhaust the resources of the insurance policy and end in little or no recovery for the Class.

   8. The Settlement is the product of extensive investigation and aggressive litigation and negotiation, and takes into account risks specific to this case. It was negotiated on both sides by experienced counsel with a firm understanding of the strengths and weaknesses of their clients' respective claims and defenses. The Settlement confers an immediate and substantial benefit on the Class and eliminates the risk of continued litigation under circumstances where a favorable outcome was at substantial risk. Lead Counsel respectfully submit that under these circumstances the Settlement is in the best interest of the Class and should be approved as fair, reasonable, and adequate.

   9. The Court should also approve the Plan of Allocation of settlement proceeds and

award 25% of the Gross Settlement Fund, or $700,000 (plus interest), as payment for attorneys' fees, and reimbursement of $35,157.97 for litigation expenses incurred in connection with the prosecution of this Litigation and for Lead Counsel's efforts in creating this substantial benefit on behalf of the Class.[1]

**SUMMARY OF PLAINTIFF'S ALLEGATIONS**

10.     This Action involves claims against Defendants by purchasers of Xethanol common stock from January 31, 2006 and August 8, 2006 (the "Class Period"). Plaintiff's Complaint alleges that, during the Class Period, Xethanol portrayed itself as an early-stage biomass ethanol production company that utilized a business model predicated upon the commercialization of biomass-produced ethanol, touting its technology, production plants, and its management's experience, all of which served to bolster the market's view that Xethanol was operating according to plan and was already reaching its second stage of development—the commercialization of biomass ethanol production. As a result, the price of Xethanol stock was artificially inflated, enabling Defendants to profit from insider sales, register for sale millions of shares of Company stock held by insiders, raise over $46 million through the private sale of equity, and cause investors to purchase shares of stock at artificially-inflated prices.

11.     The Complaint alleges facts which would have had to be proven at trial, and the proving of those facts is one of the obstacles which would have had to be overcome in order for Plaintiff to prevail at trial. The allegations claim that there were a number of concealed, adverse facts concerning the Company which were not known to investors. Among the unproven facts

---

[1] *See Schnall* v. *Annuity & Life Re,* 02 CV 2133, slip op. at 8-9 (D. Conn. Jan. 21, 2005) (awarding 33 1/3% of $16.5 million settlement fund); *In re Blech Sec. Litig,* 2002 U.S. Dist. LEXIS 23170, at *5 (S.D.N.Y. Dec. 4, 2002) (awarding 33 1/3% of fund, plus expenses, and noting that this percentage is consistent with awards made in similar cases); *Maley,* 186 F. Supp. 2d at 374 (awarding 33 1/3% of settlement fund); *In re Med. X- Ray Film Antitrust Litig.,* 1998 U.S. Dist. LEXIS 14888, at *20 (E.D.N.Y. Aug. 7, 1998) (awarding 33 1/3% of settlement fund, stating that such an award is "well within the range accepted by courts in this circuit"); *In re Warner Commc 'ns Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y. 1985) (observing that "[t]raditionally, courts in this Circuit and elsewhere have awarded fees in the 20%-50% range in class actions"), *aff'd,* 798 F.2d 35 (2d Cir. 1986).

alleged are that the Company never had the technology it touted. A former employee of Global Energy and Management during the Class Period, stated that Xethanol "didn't have the product, or as we say the 'silver bullet.'" This former employee explained that Xethanol did not have a process that could convert biomass into ethanol on a commercial scale. He/she stated that to this day, "Nobody has it." ¶29. A former human resources manager at Xethanol, who was with the Company for a three month period immediately after the end of the Class Period, further stated that Xethanol never had the necessary technology for commercial production of ethanol using biomass. ¶30. In spite of this, on March 31, 2006, Defendants filed with the SEC the Company's year-end 2005 annual report, stating that "[t]he Company plans to optimize the use of biomass in the renewable energy field and convert biomass that is currently being abandoned or land filled into ethanol or other valuable co-products. The Company's business model is to deploy proprietary biotechnologies that will extract and ferment sugars trapped in these biomass waste concentrations in a cost effective manner by locating ethanol plants closer to biomass sources and in proximity to urbanized high-demand ethanol markets." ¶67. *See also* ¶¶25-30, 41, 49, 79, 114, 136.

12.     The Complaint further alleges that Board members at the Company were "not straight with on another" and were not sharing vital information, specifically regarding the backgrounds and possible conflicts of interests of the Company's business partners. ¶31.

13.     The Complaint also alleges that the Defendants' backgrounds were not fully disclosed, especially the background of Defendant Taylor, who "had fabricated his resume, including material, relevant corporate management experience at various companies that he never worked at in any capacity." ¶32. Defendant Taylor also had a troubling history of business ventures with questionable persons, including partnering with James Hackney to form London Manhattan Ltd. Hackney was indicted for mail fraud for crimes allegedly committed while he was Taylor's partner at London Manhattan Ltd. Taylor was also named a defendant in a lawsuit by a doctor alleging that a

fraud had been committed by various persons including Taylor, who had allegedly posed as a financier interested in backing the doctor. ¶33. The Company failed to disclose Defendant Taylor's background, and make incorrect statements about his experience and expertise. ¶76. The 2005 annual report contained certifications by Defendants Taylor and Bellone that stated that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made… not misleading." ¶77. *See also* ¶¶7, 32, 33, 48, 79, 110, 112, 143.

14.     Many of the Company's initial investors also had disturbing histories of stock fraud, market abuse, breach of fiduciary duty and breach of contract. ¶35. The Complaint alleges that Defendants utilized an unusual reverse merger into a shell corporation to avoid disclosing many of these relationships and the complex web of troubling related parties. ¶37.

15.     The Complaint alleges further unproven facts regarding the Company's factories and physical plants. At all relevant times, the Complaint alleges the Hopkinton plant was *not* being refurbished but, rather, it lay abandoned and neglected with no current water or sewer service and no employees working at the site. There were no improvements whatsoever and the plant was not being used as a test facility for new technologies to convert biomass to ethanol in a commercially viable manner, nor could it be, as no such technologies had been obtained by or developed by the Company. ¶39. The Company's 2005 annual report stated that "[t]he Company is currently evaluating the possibility of utilizing the facility initially as a pilot plant for commercializing certain of its technologies and ultimately scaling up the facility once the technology proves out." ¶69. Furthermore, prior to the Company's decision to build a large plant in Augusta, a former employee informed management – including defendant Taylor– that the Company needed more time to get more work done to develop processes before they would be ready to build anything. Taylor, among others, told that employee "No," and indicated that the Augusta plant would be built

at that time, even though the technology was not ready. ¶41. That former employee also visited the Spring Hope, North Carolina, operation prior to the Company's purchase of the facility. He/she advised management not to buy the facility at the offering price because there was "no benefit" to the Company. ¶43. He/she said that the plan in place for use of the Spring Hope plant was intended to deliver the "illusion" that Xethanol was the first company that could commercially produce ethanol, but the reality was that the process proposed was not cost effective and was no different from what other ethanol producers could produce. Nevertheless, despite Former Employee #1's advice to the Company not to do the deal, defendants went through with the deal to purchase the Spring Hope Plant. ¶¶44-45.

16.     In addition to critical statements about the viability and commercialization of the Company's technologies, the 2005 Form 10-KSB also provided statements that purported to reveal transactions that had occurred between the Company and any parties related to the Company. ¶72.

17.     The Complaint further alleges that there was an undisclosed connection between Defendant Bellone's wife, Sarah Smith, and Goldman Sachs, the Company's only confirmed market-maker. Goldman Sachs invested approximately four million of dollars in Xethanol common stock. ¶40.

18.      Finally, the Complaint alleges the unproven fact that the Company's financial statements and reports were not prepared in accordance with GAAP and SEC rules, and that Xethanol did not have adequate systems of internal operational or financial controls, and Xethanol's operational and financial reports were not true, accurate or reliable. Defendants materially overstated the Company's profitability by underreporting Xethanol's true cost of completing a biomass-to-ethanol production facility and by failing to make proper, timely adjustments to the Company's stated financial reports and balance sheet. ¶¶46-47.

19.     Discovery in the form of documents produced and deposition testimony would have

had to bear out the allegations made in the Complaint. The standard at trial is preponderance of the evidence, and while Plaintiff was confident in their ability to prevail at trial on the issue of liability, there were substantial risks on liability as well as on damages and recoverability. Defendants strenuously argued that discovery would not bear out our claims, that Plaintiff's sources were not reliable and deposition testimony would confirm this.

**PLAINTIFF'S PROSECUTION OF THE CASE**

  **A.**  **The Filing of the Litigation**

  20.  The first complaint in this Action, *Ariail v. Xethanol Corp., Inc., et al.,* was filed on behalf of Plaintiff Arial by KGS on October 23, 2006. The following class action complaints were filed in the United States District Court for the Southern District of New York, as securities class actions on behalf of the purchasers of Xethanol securities, alleging virtually identical allegations:

| CASE NAME | CASE NUMBER |
|---|---|
| *Ariail v. Xethanol Corp. et al.* | 06-cv-10234 |
| *Spoto v. Xethanol Corp. et al.* | 06-cv-11476 |
| *Jones v. Xethanol Corp. et al.* | 06-cv-13128 |
| *Hamilton v. Xethanol Corp. et al.* | 06-cv-11477 |
| *Difruscio v. D'Arnaud-Taylor et al.* | 06-cv-11516 |
| *Lindberg v. D'Arnaud-Taylor et al.* | 06-cv-14448 |
| *Lemoine v. Xethanol Corp. et al.* | 06-cv-15176 |

  **B.**  **Consolidation of Actions and Appointment of Lead Plaintiff**

  21.  On February 6, 2007, the Court consolidated the cases and designated *In re Xethanol Corporation Securities Litigation,* No. 06-cv-10234 (HB) as the lead case. On March

14, 2007, the Court appointed the Counsell Group (Ronald L. Counsell, Clayton A. Leamons, John Zipay, Jr. and Ernest J. Shepherd) as Lead Plaintiff pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the PSLRA; and appointed the law firm of KGS as Lead Counsel.

### C.     Lead Plaintiff's Amended Complaint

22.     Immediately following their appointment, Lead Plaintiff initiated an aggressive and wide-ranging investigation into the facts and circumstances surrounding Xethanol's alleged false and misleading statements and omissions during the Class Period. In connection with these efforts, Lead Counsel: (a) retained an experienced outside investigation firm to conduct a full investigation into the facts and circumstances alleged in the complaints; (b) analyzed Xethanol's public statements during the Class Period, including its publicly issued financial statements; (c) collected and reviewed analyst reports and major financial news service reports on Xethanol; (d) reviewed news articles, contacted journalists, reviewed message board postings; and (e) located and interviewed a number of Xethanol employees and non-parties who had direct knowledge of the factual circumstances underlying Plaintiff's allegations.

23.     On March 27, 2007, Lead Plaintiff filed the Consolidated Amended Class Action Complaint (the "Complaint"), alleging violations of §§10(b) and 20(a) of the Exchange Act, and of Rule l0b-5 promulgated thereunder.

24.     Prior to the filing of Defendants' motion to dismiss, at Defendants' request, the parties had an in-person early settlement negotiation meeting at Plaintiff's counsel's New York offices. At that meeting, the parties were unable to reach an agreement and the litigation continued.

### D.     Defendants' Motion to Dismiss

25.     On April 23, 2007, Defendants moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Lead Plaintiff filed their opposition to the Defendants' motion on May 14, 2007, and Defendants filed their reply on May 24, 2007.

26.     In their motion to dismiss the consolidated amended class action complaint, Defendants argued that Plaintiff's 10b-5 claims should be dismissed because: Defendants statements were protected forward-looking statements; Plaintiff had not pleaded fraud with sufficient particularity or specificity under rule 9(b) and the PSLRA; Plaintiff had not pleaded scienter—specifically that Plaintiff had not sufficiently alleged motive or pleaded facts to support a finding of conscious misbehavior or recklessness; and that Plaintiff had not sufficiently pleaded loss causation. Furthermore, Defendants argued that Plaintiff's section 20 claims against the individual defendants should be dismissed because failure to state a primary claim against the Company negated any possible control person liability.

27.     In opposition to Defendants' motion to dismiss, Plaintiff argued that the Complaint adequately pleaded scienter because the allegations of conscious misbehavior and/or recklessness supported a strong inference of scienter; that numerous sources and company admissions supported the allegation that Defendants knew that the Company never had the technology it touted; that two Board members had resigned over disputes about the non-existent technology; that Defendant Taylor's resume was fraudulent, and the disclosure of this was followed by his abrupt departure from the Company; that the Company was connected to known fraudsters; that there was an undisclosed connection between the Company and Goldman Sachs, its only market-maker; that the Company had not initiated adequate internal controls; that the Company had violated Generally Accepted Accounting Principles ("GAAP"), and that

11

Defendants statements were accompanied by Sarbanes-Oxley Certifications and therefore supported a finding of scienter. Plaintiff further argued that the Complaint's allegations of motive supported a strong inference of scienter, that none of Defendants' statements was protected by the "safe harbor," that the Complaint adequately pleaded loss causation, and that the Complaint adequately alleged control person liability under Section 20(a) against the individual defendants.

28.     Defendants filed a reply to Plaintiff's opposition, reiterating their original arguments and hotly contesting Plaintiff's opposition.

29.     After hearing oral argument on July 2, 2007, the Court, in a written Opinion and Order dated September 7, 2007, denied in its entirety the Defendants' motion to dismiss the Complaint. Specifically, the Court held that Plaintiff had pleaded its claims with sufficient particularity and that its claims of scienter, loss causation, and control person liability were adequately pleaded.

**E.     Discovery**

30.     The discovery phase of the Litigation commenced immediately after the Complaint was sustained. Given the very tight timeline provided by the Court (the discovery cutoff was set for February 1, 2008 and an attempt by the parties to extend that deadline while settlement negotiations ensued was denied), Lead Counsel formulated an aggressive discovery plan seeking immediate production of all relevant documents, scheduling depositions via notice and via subpoenas, and scheduling numerous plant inspections. At the same time, Lead Plaintiff worked to retain an industry expert in order to assist Lead Counsel to analyze the technological capabilities of the Company

31.     Lead Plaintiff served its First Request for Production of Documents directed to

Xethanol on September 19, 2007. Lead Plaintiffs' First Requests for Production of Documents directed to each of the three individual defendants were served between September 18 and 20, 2007. Each request for production contained between 30 and 40 specific requests seeking information relating to, *inter alia*, the reverse-merger creation of the Company, relationships with third parties, biomass-to-ethanol technology, the plants and factories owned by the Company, meetings regarding those plants and the Company's technology implementation, and journals, diaries, and personal files regarding the Company.

32.    Defendants served their First Request for Production to Lead Plaintiffs on September 19, 2007. On October 22, 2007, Lead Plaintiffs served their written responses and objections to Defendants' Request for Production. On October 26, 2007, Defendant Taylor served his written responses and objections to Lead Plaintiffs' Request for Production.

33.    On October 26, 2007, Defendants served notices of depositions for each of Plaintiffs' four confidential sources cited in the Complaint. On the same day, Defendants served notices of depositions for each of the Lead Plaintiffs. They also served notices of deposition of Lead Plaintiff's unidentified sources, and interrogatories requesting identification of the sources within 30 days. Lead Plaintiff agreed to expedite the production of the names of the sources in order to further discovery, and notices of depositions were then served on these named sources. Service of the notices was in process at the time of the mediation.

34.    The parties agreed that each of the Lead Plaintiffs would sit for his deposition in early December in New Orleans, Louisiana.

35.    On October 29, 2007, Lead Plaintiffs produced responsive, non-privileged documents. Also on October 29, 2007, Defendants Bellone and Langberg served their written responses and objections to Lead Plaintiffs' Request for Production.

36.     On October 29, 2007, Lead Counsel sent an initial meet and confer letter to Defendants regarding various discovery issues. On November 19, 2007, Counsel for the parties met and conferred telephonically. Thereafter, numerous detailed letters were exchanged by the parties regarding discovery issues and multiple telephonic conferences were held to attempt to resolve these issues. Agreements were reached regarding a variety of discovery issues, narrowing the number of disputed issues. On October 25, 2007, Defendants served documents responsive to Lead Plaintiffs' Request for Production, consisting of thousands of pages of bates-stamped documents. Lead Counsel began reviewing and analyzing the documents immediately, strategically organizing the documents in a manner to assist with upcoming scheduled depositions and by issues. Documents were produced in hard format, and Lead Counsel developed a production document plan which included how to organize, store, and review the documents that were received from multiple sources. Prior to completing production of all documents, the Parties conferred about paper and electronic discovery. Lead Counsel developed a system for the review and organization of documents received from Defendants, including a prioritization and issue-categorization hierarchy.

37.     Lead Counsel carefully analyzed Company organizational charts and documents produced to develop a deponent list, and on October 30, 2007, Lead Plaintiffs served Defendants with Notices of Deposition of James Stewart, a current Xethanol Vice President of Plant Operations & General Manager, and of Robin Buller, a current Xethanol Vice President of Strategic Development. That same day, Lead Plaintiffs also served Notices of Inspection of Premises for Xethanol Plants located in: Blairstown, Iowa; Hopkinton, Iowa; Spring Hope, North Carolina; and Augusta, Georgia. Lead Plaintiffs interviewed various ethanol experts and chose two consultants and a videographer to assist with the plant inspections. Lead Counsel reviewed

articles and resumes to identify the top ethanol experts, especially those specializing in biomass ethanol production, and interviewed each candidate before selecting those who would assist in the inspections.

38.     On November 1, 2007, Lead Plaintiffs served Subpoenas upon third-parties Goldman Sachs & Co. and Louis Bernstein, a former Xethanol board member and former interim CEO. These subpoenas were contested, and multiple telephonic meet-and-confer conferences followed to resolve the dispute. On November 8, 2007, Defendants served their First Set of Interrogatories to Lead Plaintiffs. On November 13, 2007, Lead Plaintiffs – providing an early response to part of the interrogatory request – served Defendants with a letter identifying all confidential sources cited in the Complaint.

39.     On November 19, 2007, Counsel for the parties met and conferred telephonically, and on November 26, 2007, Defendants produced additional documents responsive to Lead Plaintiff's First Request for production. On November 27, 2007, Lead Plaintiff produced all remaining non-privileged documents responsive to Defendants' First Request for Production.

40.     In anticipation of the necessity to resolve document issues very rapidly if the case did not settle at mediation in November of 2007, Lead Counsel drafted a motion to compel addressing a number of unresolved issues with defendants. This motion was prepared but not yet filed at the time of the mediation. Ultimately, Lead Counsel conducted a comprehensive review of thousands of pages of documents, including internal memoranda and e-mail, invoices, and accounting documents.

41.     The document discovery conducted by Plaintiff uncovered new information about, *inter alia,* Xethanol's production plants and Xethanol's ability to convert biomass into ethanol, which allowed Plaintiff to further assess the strengths and weaknesses of their case.

42.     The parties prepared a confidentiality stipulation and proposed order, which they executed on November 26, 2007. The following day, on November 27, 2007, Lead Plaintiffs produced all remaining non-privileged documents responsive to Defendants' First Request for Production. By November 26, 2007, Defendants had produced additional documents responsive to Lead Plaintiffs' First Request for production. Lead Counsel carefully reviewed and analyzed all documents produced by Defendants. In addition, Lead Counsel prepared subpoenas for documents from third parties, most notably Louis Bernstein and Goldman Sachs & Co.

**F.     Evidence of Market Efficiency**

43.     In order to determine market efficiency, District Courts consider the *Cammer* factors. *See Cammer v. Bloom*, 711 F.Supp. 1264, 1286-87 (D. N.J. 1989). The First Circuit has summarized those factors as "(1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price." *In re Xcelera.com Secs. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) (citing *Cammer*).

44.     Lead Plaintiff consulted with an expert regarding market efficiency as it relates to potential class certification hurdles. While Plaintiff believed that its market efficiency claims were strong and would be upheld at trial, there were risks attendant on the market efficiency issue. As alleged in the Complaint, Plaintiff believes that at all relevant times, the market for Xethanol stock was an efficient market. ¶168. Regarding the Cammer factors, the average daily trading volume of Xethanol shares was approximately 495,000 during the Class Period. Approximately 64 million shares traded during the Class Period. This high average speaks in

16

favor of an efficient market.

45.     Xethanol was followed by securities analyst Soleil Securities who wrote reports which were distributed to the sales force and certain customers of the brokerage firm. The fact that Plaintiff could not identify more than one securities analyst following Xethanol was a potential weakness of the market efficiency claims.

46.     Goldman Sachs was a market-maker with a strong interest in Xethanol securities. Market-makers in a security are another indication of market efficiency, but in this case Lead Plaintiff could only positively establish the existence of one market maker, and according to Plaintiff's Complaint allegations, that market maker had questionable ties to the Company, possibly undermining the significance and independence of their market-making.

47.     Further supporting Plaintiff's market efficiency claims, however, the Company filed SB-2 Registration Statements, which is a near-equivalent to an S3 Registration Statement, permitted only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.

48.     Additionally, the price of Xethanol shares reacted quickly to unexpected news events, including the Company's positive press releases as well as negative news reported on the Internet and/or in the print media about the Company. The price of Xethanol shares rose and fell in response to positive and negative news during the Class Period.

49.     The movement of Xethanol's stock price shows a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price, as demonstrated by the following events:

> (a) the Company's February 27, 2006 press release announcing that Xethanol had selected a stock promotion company named Zangani to further expose the Company to the investor

community *via* webcasts and podcasting—the Company's stock rose from $6.60 to $6.75**;**

(b) the Company's 2005 Form 10-KSB, filed on March 31, 2006, announcing its 2005 financial results—the Company's stock rose from $6.80 to $6.90;

(c) the Company's April 4, 2006 press release announcing that the Company had negotiated to raise up to another $46 million in new private equity funding—the Company's stock rose from $8.20 to $8.90;

(d) the Company's April 11, 2006 press release announcing that Xethanol was exploring strategic growth opportunities in California—the Company's stock rose from $12.31 to $12.35;

(e) the Company's April 21, 2006 press release announcing that Xethanol had entered into a "strategic equity" arrangement with H2Diesel, Inc. to produce "BioDiesel" fuel—the Company's stock rose from $14.6 to $15.16;

(f) the Company's April 28, 2006 press release announcing that the Company was set to expand in New England after forming an alliance with Global Energy Management—the Company's stock rose from $12.50 to $12.71;

(g) the Company's May 24, 2006 press release announcing that the Company had signed a letter of intent to acquire another

plant, located in Augusta, Georgia—the Company's stock rose from $10.75 to $11.29;

(h) the Company's May 31, 2006 press release announcing an "alliance" with Coastal Energy Development—the Company's stock rose from $9.41 to $9.60;

(i) the Company's June 14, 2006 press release announcing that the Company had purportedly acquired additional biomass technologies essential for the conversion of biomass into ethanol—the Company's stock rose from $8.55 to $8.91;

(j) the Company's July 5, 2006 press release announcing that Xethanol had selected PRAJ Technology to design a new 35 million gallon ethanol facility at its Blairstown, Iowa site—the Company's stock rose from $9.90 to $10.05; and

(k) the Sharesleuth.com August 8, 2006 publication of a report that was highly critical of Xethanol—the Company's stock fell from $6.47 to $5.95.

50.    There were therefore both strengths and weaknesses in Plaintiff's market efficiency claims, and market efficiency could have proven to be a significant hurdle at the class certification stage of this litigation.

G.    **Settlement Negotiations**

51.    Having completed a significant amount of discovery, and understanding the strengths and weaknesses of their case, Lead Plaintiff continued discussions with the Defendants in an attempt to resolve this matter. Near the beginning of October, 2007, the Parties agreed to

attempt to mediate the case. In light of this agreement, the parties sought to extend the discovery schedule. This request was denied, and Lead Plaintiff therefore pursued both discovery and mediation with an imminent discovery cut-off. On November 28, 2007, Lead Counsel, Counsel for Defendants, and Xethanol's CEO David Ames and COO Thomas Endres met in West Palm Beach, Florida to mediate the case before a retired Federal Judge, the Honorable Nicholas Politan. After a lengthy mediation session, the parties reached a resolution and agreed in principle to settle the Litigation. This Settlement was based in part on the fact that Defendants' insurance coverage was wasting and limited, and would not cover all of the claims brought against them. The Company's ability to pay was also severely limited, and the settlement represented, in the opinions of Lead Plaintiff and Lead Counsel, the best obtainable result for the Class.

52.     After the agreement-in-principle was reached, however, the parties continued to negotiate the specific terms of the Settlement. The parties executed a Stipulation of Settlement on April 29, 2008. After the agreement in principal was reached, two issues arose regarding the terms and conditions of the settlement. Lead Counsel consulted with the mediator, and a variety of email and telephonic meet and confers with Defendants followed. The parties ultimately resolved these issues.

53.     Throughout the course of these negotiations, all parties were represented by counsel with extensive experience in securities class actions. There can be no question that the Settlement was the result of vigorous arm's-length negotiations.[2]

---

[2] *See, e.g, In re Indep. Energy Holdings PLC Sec. Litig.,* No. 00 Civ 6689 (SAS), 2003 U.S. Dist. LEXIS 17090, at *13 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable."); *In re Am. Bank Note Holographics, Inc. Sec. Litig,* 127 F. Supp. 2d 418, 428 (S.D.N.Y. 2001) ("Courts have looked to ensure that the settlement resulted from 'arm's-length negotiations' between counsel possessed of 'experience and ability necessary to effective representation of the class's interests.'") (quoting

54.     As a result of Lead Plaintiff's extensive investigation and discovery efforts, Lead Counsel have been able to asses the risks attendant on this case. Lead Counsel have considered the risks of litigation, the likelihood of obtaining strong evidence in support of their claims, defeating summary judgment after deposition discovery, and, if successful on the motion for summary judgment, the substantial risk, expense, and length of time to prosecute the Litigation through trial and the inevitable subsequent appeals. Lead Counsel have also considered the monetary benefit provided by the Settlement in light of the risk of taking the case to trial, which benefit was the greatest which could be obtained in light of the Company's limited insurance coverage and the unlikelihood that the Company could withstand a greater judgment.

55.     Lead Counsel also have considered the Settlement in light of very real economic realities, most significantly the risk that even if Plaintiff were to successfully litigate the action to verdict, a judgment in excess of the amount of the Settlement might force Xethanol into bankruptcy and the Class might never recover its losses.[3] The Company provided Lead Counsel with internal, non-public financial information showing that the Company's future, absent settlement, was uncertain. Moreover, the Company's insurance coverage for this litigation consists of only a single wasting policy. Of the Settlement Fund, $2,400,000 was to be provided by Defendants' insurers and $400,000 to be provided by Defendants themselves.

56.     Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. KGS's attorneys' experience in the more than 20 class actions in which we have been appointed Lead Counsel, as well as its reputation for vigorous

---

*Weinberger* v. *Kendrick,* 698 F.2d 61, 74 (2d Cir. 1982); *Wiess* v. *Blech,* Nos. 94 Civ. 7696 (RWS), 95 Civ. 6422 (RWS), 2000 U.S. Dist. LEXIS 6920, at *13 (S.D.N.Y May, 22, 2000).
[3] *See, e.g., In re EVCI Career Colleges Holding Corp. Sec. Litig*., 2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007) (considering defendants' ability to pay as a factor in favor of the benefit of settlement); *Long Island Lighting,* 907 F.2d at 1325 (risk that a higher award would bankrupt the defendant militated in favor of approving the settlement); *Bello* v. *Integrated Resources, Inc.,* No. 88 CIV 1214 (CSH), 1990 WL 200670, at *2 (S.D.N.Y. Dec. 4, 1990) (same).

advocacy, gave the firm a strong position in engaging in settlement negotiations with the Defendants, even under the difficult and challenging circumstances presented here.

57.    After negotiations concerning the final terms of the Settlement, the parties executed the Stipulation and submitted it to the Court for preliminary approval on April 29, 2008.

58.    Lead Counsel respectfully submits that the Settlement represents an excellent result for the Class under the circumstances. The Settlement will provide Class Members with a concrete financial benefit without the very real risk of a no-recovery situation possible if the Litigation were to continue.

**H.    Preliminary Approval of Settlement and Mailing of Publication of Notice of Settlement**

59.    At the preliminary approval hearing for the Settlement on May 13, 2008, the Court preliminarily approved the terms of the Settlement and directed that the Claims Administrator, Complete Claim Solutions, cause the mailing of the Notice of Pendency of Class Action and Proposed Settlement (the "Notice") and the Proof of Claim and Release form (the "Proof of Claim") to all potential Class Members identifiable with reasonable effort (the "Preliminary Approval Order").

60.    The Court's Preliminary Approval Order also directed Lead Counsel to cause the notice for publication ("Publication Notice") to be printed in English in the national edition of *Investor's Business Daily*, on three consecutive business days, not later than June 5, 2008. Lead counsel were directed by the Court to publish notice in the *Wall Street Journal*, but Lead Counsel brought to the Court's attention a cost analysis of that publication; the Court then ordered publication in *Investor's Business Daily*, resulting in substantial savings for the Class. At Lead Counsel's suggestion, publication of the Summary Notice was also issued on the PR News

Wire.

61.     Submitted herewith is the Declaration of Peter M. Craig of Complete Claim Solutions, the Claims Administrator, regarding: A) Mailing of Notice of Pendency of Class Action and Proposed Settlement With All Defendants, Motion for Attorneys' Fees, and Settlement Fairness Hearing and the Proof of Claim and Release; B) Publication of Summary Notice; and 3) Issuance of Press Release (the "Craig Decl."). Peter Craig is the Senior Project Administrator of Complete Claim Solutions, the Claims Administrator, and his Declaration attests that Notices have been mailed to 22,560 potential Class Members. The Craig Declaration also attests to the printing of the Publication Notice and the newswire press release of the Notice on August 25, 2008, as directed by the Court.

62.     The Notice informed Class Members of the terms of the Settlement, the Plan of Allocation of the Settlement proceeds, and that Lead Counsel are moving the Court to award attorneys' fees in an amount not greater than thirty percent (30%) of the Gross Settlement Fund, and for reimbursement of expenses incurred in connection with the prosecution of this Action, not to exceed $40,000.

63.     The Notice also provided that any objections to the Settlement, the Plan of Allocation, or the application of attorneys' fees and reimbursement of expenses had to be filed by August 29, 2008. That date has now passed, and to the knowledge of Lead Counsel, no objections have been filed to the Settlement, Plan of Allocation, or application for reimbursement of expenses by any Class Members. A single objection has been received regarding attorneys' fees. That objection, addressed more fully in the memorandum of law in support of motion for an award of attorneys' fees and reimbursement of expenses, contends that the requested award of $33^{1}/_{3}\%$ is excessive given the stage of litigation reached at the time of

settlement. The objection is factually incorrect as to not only the award requested by Lead Counsel (actually 25%), but also as to the stage of litigation, the extent of formal discovery, and the time expended by Lead Counsel in pursuing this litigation.

**FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT**

      **A.**    **The Settlement Was Fairly and Aggressively Negotiated by Counsel**

     64.    As set forth above, the terms of the Settlement were negotiated by the Parties at arm's length through adversarial but good faith negotiations. The Settlement was the product of a mediation involving Lead Counsel, Counsel for Defendants, and Xethanol's CEO David Ames and COO Thomas Endres in West Palm Beach, Florida before the Honorable Nicholas Politan. All counsel had extensive experience in securities litigation in general and securities class actions in particular. The Settlement was the result of an adversarial process designed to produce a fair, reasonable, and adequate compromise.

      **B.**    **Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt**

     65.    Another factor considered in assessing the merits of class action settlements— whether serious questions of law and fact exist—supports the conclusion that the Settlement is fair, reasonable, and adequate to the Class. As in every complex securities law case of this kind, Plaintiff and the Class faced significant obstacles to recovery, both with respect to liability and damages. While Plaintiff and their counsel believe that Plaintiff's allegations have substantial merit, the Defendants denied liability and asserted that they possessed absolute defenses to Plaintiff's claims.

     66.    Throughout the course of this Litigation, Plaintiff has believed that significant evidence supports their allegations. At the same time, however, they came to realize that equally significant hurdles existed such that prevailing at trial would be difficult. The major issues

24

confronting Plaintiff were the inability of the Company to withstand a greater judgment; the possibility that the Company was not operating in an efficient market; and the difficulty of proving scienter.

67.     As discussed above, one hotly contested issue during the mediation and settlement negotiations was the Company's ability to pay. The Company's insurance coverage was severely limited to a single policy, which was also a wasting policy which would be further depleted by continuing litigation. The Company, which seemed to be on the verge of bankruptcy, was able to contribute a very limited amount of cash to the settlement in addition to the $2,400,000 provided by the insurance. There were serious concerns that, should the Action proceed to further stages of litigation or even to trial, the Company's resources would be completely wiped out, resulting in a zero recovery for the Class. There was also the possibility that Plaintiff would not prevail at trial, should the litigation proceed to trial. Plaintiff believed firmly that the Company operated in an efficiency market at all times relevant to the Complaint. However, there were risks in the market efficiency analysis and a finder of fact could well have determined that the Xethanol market was not efficiency for purposes of class certification. Another serious issue was the question of scienter, which was central to the motion to dismiss in this Action. While the Court determined that Plaintiff had adequately *alleged* scienter in the Complaint, scienter would have had to be proven at trial, and could have been an obstacle to Plaintiff ultimately prevailing in this Action.

68.     Other questions included:

(a)  whether Xethanol actually lacked the technological capability to make ethanol from biomass in a commercially viable manner;

(b)  whether Xethanol was being run by management with a lack of credibility and high standard of ethics;

(c)  whether the Company had improper third-party transactions that were not properly disclosed;

(d)  whether the Board members were "not straight with each other" and "did not share vital information" with all their members;

(e)  whether the plants purchased by Xethanol were used to create an "illusion" that Xethanol was commencing commercialization of biomass-to-ethanol production;

(f)  whether Defendant Bellone's wife, Sarah Smith, was the sole driving force behind Goldman Sachs' decision to make a market in Xethanol stock;

(g)  whether Xethanol had inadequate systems of internal operational or financial controls;

(h)  whether Defendants materially overstated the Company's profitability by underreporting Xethanol's true cost of completing a biomass to ethanol production facility and by failing to make proper, timely adjustments to the Company's stated financial reports and balance sheet;

(i)  whether the Company's financial statements and reports were inadequately prepared in violation of GAAP and SEC rules; and

(j)  the loss attributable to the alleged fraud.

69.     Although Lead Plaintiff has throughout this litigation been, and remains now, confident that the Class's claims would prevail at trial, these serious obstacles make the outcome far from certain, and Lead Plaintiff acknowledges that pursuing the litigation through trial might not end in a positive result for the Class.

**THE PLAN OF ALLOCATION**

70.     Pursuant to the Notice Order and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees, and reimbursement of expenses, the Net Settlement Fund will be distributed according to the Plan of Allocation.

71.     If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Proof of Claim forms. The "adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re PaineWebber Ltd. P 'ships Litig.,* 171 F.R.D. 104, 133 (S.D.N.Y. 1997); *In re Luxottica Group Sp. A. Sec. Litig.,* 233 F.R.D. 306, 316-17 (E.D.N.Y. 2006).

72.     The proposed Plan of Allocation provides:

> "The Gross Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed to members of the Class who submit acceptable Proofs of Claim ("Authorized Claimants")…The Claims Administrator shall determine each Authorized Claimant's pro rata share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim." The Recognized Claim formula is not intended to be an estimate of the amount of what a Class Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to

the settlement. The Recognized Claim formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants…Each Authorized Claimant shall be allocated a pro rata share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. Distributions will be made to Authorized Claimants after all claims have been processed and after the Court has finally approved the settlement."

73.    An Authorized Claimant's Recognized Claim will be calculated as follows:

"For those who purchased shares of Xethanol between January 31, 2006 and August 7, 2006, inclusive, and sold the shares on August 8, 2006, recognized loss per share is the lesser of: (1) The price paid less the price received; OR (2) .96. For those who purchased shares of Xethanol between January 31, 2006 and August 7, 2006 and held such shares on August 9, 2006, and sold between August 9, 2006 and August 15, 2006, inclusive, recognized loss per share is the lesser of: (1)$1.66; (2) The amount paid less the amount received; OR (3) The amount paid less $5.25. For those who purchased shares of Xethanol between January 31, 2006 and August 7, 2006 and held these shares after August 15, 2006, recognized loss per share is the lesser of: (1) $1.66; OR (2) The amount paid less $5.25. For those who purchased shares on August 8, 2006 and sold these shares on August 8, 2006, recognized loss per share is the price paid less the price received. For those who purchased shares of Xethanol on August 8, 2006 and sold those shares between August 9, 2006 and August 15, 2006, inclusive, recognized loss per share is the lesser of: (1) $0.70; (2) The amount paid less $5.25; OR (3) The amount paid less the amount received. Finally, for those who purchased shares on August 8, 2006 and held those shares on August 16, 2006, recognized loss per share is the lesser of: (1) $0.70; OR (2) The amount paid less $5.25."

74.    In the event a Class Member has more than one purchase or sale of Company common stock, all purchases and sales shall be matched on a First In First Out ("FIFO") basis. Class Period sales will be matched first against any Company shares held at the beginning of the Class Period and then against purchases in chronological order. A purchase or sale of Company common stock shall be deemed to have occurred on the "contract" or "trade" date. The receipt or grant by gift, devise, or operation of law of Company common stock during the Class Period

shall not be deemed a purchase or sale for the calculation of an Authorized Claimant's Recognized Claim nor shall it be deemed an assignment of any claim unless specifically provided in the instrument of gift or assignment. To the extent that a Claimant suffered an overall loss in Company common stock during the Class Period, but that loss was less than the Recognized Claim calculated above, then the Recognized Claim shall be limited to the amount of actual loss.

75.     For purposes of determining whether a Claimant had a gain from overall transactions in Company common stock during the Class Period or suffered a loss, the Claims Administrator shall: (i) total the amount paid for all Company common stock purchased during the Class Period by the claimant (the "Total Purchase Amount"); (ii) match any sales of Company common stock during the Class Period first against the Claimant's opening position in the stock (the proceeds of those sales will not be considered for purposes of calculating gains or losses); (iii) total the amount received for sales of the remaining shares of Company common stock sold during the Class Period ("Sales Proceeds"); and (iv) ascribe a $3.82 per-share holding value for the number of shares of Company common stock purchased during the Class Period and still held at the end of the Class Period ("Holding Value"). The difference between the Total Purchase Amount, the sum of the Sales Proceeds, and the Holding Value will be deemed a Claimant's gain or loss on overall transactions in Company common stock during the Class Period.

76.     Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among Class Members.

**FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD**

77.     The amount that Lead Counsel are seeking as attorneys' fees is limited to 25% of

the Gross Settlement Fund. It is respectfully submitted that such amount, well below the negotiated fee cap of 33-1/3%, is fair and reasonable and reflects a market-rate fee as contemplated under the PSLRA's provisions for selection of Lead Plaintiff and Lead Counsel.

78.    As set forth in the Memorandum of Law in Support of the Petition for an Award of Attorneys' Fees and Reimbursement of Expenses, Lead Counsel are requesting 25% of the Gross Settlement Fund, or $700,000 (plus interest), as payment for attorneys' fees, and $35,157.97 in reimbursement of litigation expenses incurred in connection with the prosecution of this Litigation. The Notice informed Class Members that Lead Counsel would seek this fee percentage, which has been approved by the Court-appointed Lead Plaintiff.

**A.    The Time and Labor Expended by Counsel**

79.    Lead Counsel achieved this very favorable result for the Class at great risk and substantial expense to themselves. They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion. The requested fee is reasonable based on the quality of Lead Counsel's work and the substantial benefit obtained for Class Members.

80.    Lead Counsel's compensation for the services rendered is wholly contingent. The expenses incurred in the prosecution of the Litigation are set forth in the accompanying affidavits from Lead Counsel, which are submitted herewith. Lead Counsel, in seeking reimbursement of expenses, have averred that the expenses are reflected in the books and records maintained by the firms and are an accurate recording of the expenses incurred. In total, according to those accounting records, Lead Counsel have incurred reimbursable expenses in the amount of $35,157.97. Included in this amount are the fees paid to the consultants who provided Plaintiff with extensive assistance during this Litigation. Plaintiff respectfully submits that all of these

expenses are reasonable and were necessarily incurred in connection with the prosecution of this Litigation.

### B.      Extent of Litigation

81.      As described above, this case was settled only after Lead Counsel had conducted an extensive investigation into the Class's claims, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses, prepared a fact-specific and detailed Complaint laying forth Defendants' alleged violations of the federal securities laws, successfully opposed Defendants' motion to dismiss, vigorously conducted document discovery, served subpoenas on witnesses, met with consultants, considered the risks of continued litigation, and engaged in extensive settlement negotiations, resulting in a beneficial settlement for the Class.

82.      Defendants moved to dismiss the Complaint. After briefing, this Court, by order dated September 7, 2007, denied Defendants' motion to dismiss. Lead Counsel engaged in extensive document discovery and conducted a mediation with counsel for Defendants, Xethanol CEO David Ames, and Xethanol COO Thomas Endres. Lead Counsel were able to obtain through negotiation and mediation a Cash Settlement Amount of $2.8 million. In consultation with their damages consultant, Lead Counsel also prepared the Plan of Allocation of the settlement proceeds. Furthermore, the legal work required of Lead Counsel will not end with the Court's approval of the Settlement. Additional hours and resources will necessarily be expended assisting Class Members with the filing of their Proof of Claim and Release forms and related inquiries, and the distribution of the Net Settlement Fund.

### C.      The Risks of Litigation

83.      This Litigation was undertaken by Lead Counsel on a wholly contingent basis. From the outset, Lead Counsel understood that they were embarking on a complex, expensive,

and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of the Litigation and that funds were available to compensate staff and to pay the considerable out-of-pocket costs which a case such as this entails. In addition to advancing litigation expenses and paying overhead, Lead Counsel faced the possibility of no recovery.

84.     Because of the nature of a contingent practice, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation. The financial burden on counsel working on a contingent fee retainer is far greater than on a firm that is paid on a current and ongoing basis.

85.     Lead Counsel undertook to act for Plaintiff in this matter aware that they would be compensated only by obtaining a successful result. The benefits conferred on Plaintiff and the Class by this settlement are particularly noteworthy in that a settlement fund worth $2.8 million (plus accrued interest) was obtained for the Class.

### D.     Complexity of the Litigation

86.     Lead Counsel drafted a detailed amended complaint, overcame Defendants' motion to dismiss, conducted significant discovery, and obtained a very good recovery for the Class. If Lead Counsel had not negotiated this Settlement, this complex securities action, involving numerous complex legal and factual issues, would require further voluminous document and deposition discovery. To prevail at trial, Plaintiff would necessarily have to convince the jury that Defendants had perpetrated a fraud and that this conduct caused their losses. Further, Plaintiff would have to calculate the size and extent of the fraud. Short of obtaining an admission of liability from Defendants, this proof would necessarily be in the form

of circumstantial evidence which is primarily within Defendants' control.

87.     Assuming the Action survived any motion for summary judgment, trial preparation, followed by the trial itself, would have required many additional hours of work and significant judicial resources, with the appearances of experts and the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditures of judicial resources. The "normal" cost of litigation, including copying, travel, depositions, computer support services, and other necessary expenses, would also be quite high. Here, however, Lead Counsel were able to obtain a settlement of $2.8 million without exposing the Class to the continued risk and the additional costs of further litigation.

### E.     Standing and Expertise of Lead Counsel

88.     The expertise and experience of Lead Counsel is described in the declarations of counsel submitted herewith, attaching the firm's biography. Lead Counsel have extensive experience in complex litigation and are nationally known leaders in the field of securities class actions.

### F.     Standing and Caliber of Opposition Counsel

89.     Defendants are represented by an experienced law firm that possess substantial experience and expertise in the defense of complex securities litigation. In the face of this formidable opposition, Lead Counsel defeated the Company's Motion to Dismiss, engaged in and intensive document discovery and meet and confer process with Defendants, and pressed to successfully settle while simultaneously moving forward with the scheduling of depositions and inspections and working towards meeting a very tight discovery cut off of February 1, 2008. Indeed, Lead Counsel attempted to extend the schedule to focus on the mediation but the Court denied this request. Thus, Lead Counsel were operating relentlessly on the two different tracks of

discovery and settlement simultaneously.

**CONCLUSION**

90.    For the reasons set forth above and in the accompanying Memorandum of Law in Support of Notice of Motion For Final Settlement Approval, and Memorandum of Law in Support of Petition for an Award of Attorneys' Fees and Reimbursement of Expenses, we respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be approved; and (b) the application for attorneys' fees and reimbursement of expenses should be granted.


I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct. Executed this 8th day of September, 2008 at New York, New York.


                                _/s/ Kim E. Miller_____
                                KIM E. MILLER